**HENKEL CORPORATION, Plaintiff,**

v.

**CORAL, INC., Defendant.**

**No. 89 C 3385.**

United States District Court, N.D. Illinois, E.D.

Dec. 28, 1990.

As Corrected March 6, 1991.

---

William Denby Heinz, Jenner & Block, Chicago, Ill., for plaintiff.

Dennis R. Schlemmer, John Kilyk, Jr., Leydig, Voit & Mayer, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

### BACKGROUND [1]

The plaintiff, Henkel Corporation ("Henkel") brought this action seeking at

---

**1.** Sources and authorities for the special state- ments contained in this part of the Memoran-

the outset a preliminary injunction to restrain the defendant, Coral, Inc. ("Coral") from infringing Henkel's patent United States Patent No. Re. 32,661, by manufacturing and selling a low temperature cleaner called Clene 100/ACC–2 to manufacturers of aluminum cans for the food and beverage industry. The defendant responded with a motion for summary judgment. The matter proceeded in its early stages before the court on both matters, the parties supporting their positions with extensive briefs and voluminous submissions of evidentiary materials. In an opening memorandum and order this court set the matter down for an evidentiary hearing with live witnesses and further evidentiary submissions to be followed by oral arguments and post-hearing briefs. Transcripts of these matters fill many pages, and the documented evidence and written arguments have been exhaustive. The written printed and transcribed materials submitted to the court by the parties fill many thousands of pages.

Even though the subject matter relates to a recent modernization almost so ordinary in the grocery shopping experiences of the youngest adults among today's general population as to have transpired without much notice, the technical matters involved impressed the court with the need of the ordinary consumer for being educated about the manufacturing of containers for the daily marketing of beverages. The court itself learned that the change from bottled beverages to the use of three piece soldered "tin" cans and then to cans punched in paper thin sheets of aluminum has been but a part of a recent expansion of the use in industry of chemicals and water for cleaning purposes during the shaping of metal parts that are indispensable to the myriad of mechanisms that permeate modern life.

The availability of the aluminum can as a beverage container answered a restless need because of its light weight, its strength, its appearance and its ability to leave undisturbed the original flavor of the beverage; but in return for all of its advantages it presented problems in its own manufacturing process. For example, aluminum oxidizes when heated during its forming process, leaving residues that have to be removed. Also, during the forming process lubricants have to be used which, along with so-called aluminum fines left on the surfaces, have to be removed. In addition, since both the insides of the cans which have to be left spotless and as pure as the beverages themselves, and the outsides of the cans on which painted messages have to be sprayed, both the insides and the outsides of the cans require that the surfaces of the metal must be cleaned to a degree that is called "water-break-free", a term that means that the water runs evenly over and off the surfaces of the aluminum without beading. If beading occurs the interiors would not be substance free and the coatings that later would be applied to the outsides would not lay down uniformly.

The cleaning of metal products in industry is not new, but from almost the beginning of the use of aluminum cans for beverages the industry has been busy turning out various cleaning solutions, some containing alkaline combined with a detergent—these gaining only limited acceptance, and some containing acids combined with detergents, but they have had to be maintained for use at relatively high temperatures and this has always presented difficulties with the machinery used in the forming process as well as with the aluminum itself. The acid generally used has been sulfuric acid, and the temperature of the chemical "bath" has until recently been required to be kept between 170–190 degrees F.

When heated sulfuric acid solutions proved usable, their use still had negative secondary effects. First, they proved to be caustic, eating away at the applicating equipment, including the spray nozzles, and they continue to incur high heating costs. The industry has remedied some of the

dum can be found in the Findings of Fact and Conclusions of Law appended to this Memoran-

dum.

early problems of corrosion by adding chromates but these also have continued to produce negative side-effects. Chromates were found to be carcinogenic and toxic to the industrial plants and the plant workers.

According to the discussions of both parties in this case the history of the pioneering in the development of both an aluminum surface cleaning composition and a method for applying the cleaner, or a combination of both a composition and a process, begins with an article published in the Journal of the American Welding Society by a research authority on the treatment of aluminum composites for airplane parts named W.F. Hess. Hess found that a combination of hydrofluosilicic acid and a wetting agent was a suitable solution for accomplishing his special purposes.

Twenty years later in 1964 one John J. Grunwald obtained a patent numbered 3,140,203 and entitled "A Method of and Composition for Treating Aluminum and Aluminum Alloys." His patent taught that a strong oxidizing agent called persulfate, when added to sulfuric acid produced a solution for effectively deoxidizing and desmutting aluminum.

In 1970 a patent was issued to a Floyd L. Mickelson and a Robert Bland and numbered 3,510,430, for a composition for treating aluminum surfaces which avoided using either hydrofluoric acid or sulfuric acid by making a combination of specific amounts of ferric sulfate, alkali metal bisulfate, alkali metal nitrate and alkali metal silicofluoride.

Then in 1973 Patent No. 3,728,188 was issued to a Robert Warren Yarrington for a chrome-free deoxidizing and desmutting composition and method that would serve as a follow-up cleaner for aluminum surfaces to be applied after the use of the Grunwald or the Mickelson composition.

In 1972 a company named Amchem, the company from whom just before the filing of this case the plaintiff herein, the Henkel Corporation purchased the patent that is the subject matter of this case, assigned one of its research chemists, a Robert E. Binns, to the task of developing an aluminum can cleaner that would effectively clean aluminum cans for use in the beverage industry and do so at low temperatures. Binns eventually added to the then well known use of sulfuric acid various quantities of fluoride and then combined them with a surfactant, itself as in the instant patent in specific amounts and qualities, one of the distinguishing features between the patent in suit and the prior art, in such a manner as to effect a cleaner that would not only work at an especially low temperature but would clean surfaces to a "water break free" condition.

As Binns progressed with his inventing, using various combinations of his products he applied for and eventually received a series of three patents. In 1977 U.S. Patent 4,009,115 (the '115 patent) was issued to him and assigned to his employer. It was for a "Composition and Method for Cleaning Aluminum at low temperatures." Then on September 26, 1978 U.S. Patent 4,116,853 (the '853 patent) was issued to him. It was for a composition for cleaning aluminum surfaces. Finally, on November 7, 1978 U.S. Patent 4,124,407 (the '407 patent) was issued to him claiming a method for cleaning aluminum surfaces when using the compositions described in the two earlier patents. The '407 patent was a special method for using the '115 and the '853 compositions. As Binns progressed with his research his patent prosecutions in the Patent Office were the subject of continuous competitive objections and challenges before the examiner led by the defendant in this case, the Coral Company. Amchem, to whom Binns had assigned all three patents initiated reissue proceedings in the Patent Office on all three patents in September of 1980, and after conducting these contested proceedings the Patent Office reissued '407 (the method for applying the '115 and '853 compositions) as Patent No. Re. 31,198. This reissue was on April 5, 1983. Finally, two and a half years later, as a result of its undergoing substantial changes, the reissue proceedings which had been begun on the original '115 patent culminated in the reissue of that patent as Patent No Re. 32,661. This happened on May 3, 1988.

In the meantime back in 1983, as soon as the reissue of Binns' third patent, his '407 patent as Patent No. Re. 31,198 came through, Amchem Products Company, to whom Binns had assigned the patent, brought a suit against Coral Chemical Company, the defendant herein, charging that Coral's product Clene 100/ACC–2 infringed the '198 patent. That case was assigned to a colleague of the instant Judge, the Honorable Prentice H. Marshall, a judge of this court who commands great respect from the bench and bar for the excellence of his judicial performance. When the case was brought before him the application for reissue of the original '115 patent was still under prosecution before the Patent Office, and when in August of 1987 Judge Marshall decided Amchem's battle with Coral over the '198 patent the reissue of the '115 patent was still being prosecuted.

Judge Marshall on August 31, 1987 decided the '198 patent claim of Amchem in favor of Coral. The reissue of the '115 patent was still before the Patent Office, and though his decision about the '198 patent became a matter of concern for the Examiner in Washington it had been impossible for Judge Marshall in his decision to have taken into consideration what would be happening to the reissue prosecution of the '115 patent. Judge Marshall ruled in favor of Coral on the ground that the '198 patent was invalid for want of novelty. He determined that one skilled in the art of the "removal of lubricants and fines from aluminum alloys" would find the '198 invention obvious. Even though Judge Marshall's decision on '198 was brought to the attention of the Examiner in the '115 reissue proceedings, the Examiner concluded that the invention before him was not anticipated by the prior art and on May 3, 1988 allowed its reissue as Patent No. Re. 32,-661. Shortly thereafter Amchem transferred ownership of the '661 patent to the plaintiff herein, the Henkel Corporation which forthwith brought this case against Coral. Coral defends on the ground that the doctrine of Collateral Estoppel causes Judge Marshall's decision to apply to this case also and similarly to render '661 invalid also because of obviousness.

## ISSUE PRECLUSION

In opposition to Henkel's seeking to enforce by injunctive relief its rights under the Re. '661 patent Coral demurs by its motion for summary judgment, acknowledging thereby the copying of which it is accused, by calling the court's attention to the fact that a year earlier another judge of this court, the Northern District of Illinois, decided that the closely related patent, Re. '198, was void for reasons of obviousness, and by calling this judge's attention to the doctrine of "collateral estoppel." Under the doctrine of "collateral estoppel" (and for purposes of this case it can be referred to as "issue preclusion") I am prohibited from relitigating a controlling issue of fact that already has been determined between the same parties by the same court (and the Northern District of Illinois is under this doctrine one and the same court regardless of differences in judges rendering its decisions). And it is true that the Reissued Patent Re. '198 and the instant patent Reissue '661, though its reissue was granted a year after the decision invalidating the '198 patent, both were born of the same concept for cleaning the surfaces of an aluminum alloy used in the beverage can industry.

Judge Marshall in his case described the history of the Binns efforts to patent an invention to solve the problems of the cleaning of aluminum beverage cans by filing a series of three patent applications in the place of his very first application in which he had claimed both a *composition* and a *method*. These three application issued, two for *a composition* and one for *a method*. Then when, according to Judge Marshall, this attempt at monopoly was challenged by Coral relying on a "considerable collection of prior art." Amchem was considered to have been responding by instituting reissue proceedings on all three patents, utilizing new language to constitute a narrowing of limitations all for the purpose of avoiding Coral's challenges. In the words of Judge Marshall, "the tactic worked." Tracing the experiences of these reissue applications before the Patent Of-

fice up until the time of the Re. '198 case before him (reissue of what became '661 had not been completed at the time he had the '198 reissue before him) Judge Marshall found that what Binns claimed in '198 to be novel was obvious and unpatentable over the prior art of Hess, Grunwald, Mickelson and Yarrington. Judge Marshall was of the opinion that the prior art was broad enough to embrace both a cleaning compound and a cleaning process, including the specifications of the '198 patent.

The first question this court must now answer is whether under the doctrine of "collateral estoppel" it is precluded from deciding in this case a controlling issue which presumably was decided by Judge Marshall in the case before him. This is a case between the same parties (Henkel in the instant case stands in the identical shoes of Amchem in the earlier case), and the questions in both cases relate to the prior art's insight into the subject matter of both cases. The question is "Do the claims in both cases cause the decision in the earlier case to read upon whatever decision this court may make?" If they do so read then the instant case must stand as having already been decided by Judge Marshall.

It is the position of both judges to whom this area of invention has been submitted that the purpose of the patent procedure is to encourage the availability to the public of novel and useful contributions to the arts and sciences. An awareness of a need for advancement in the industry that has gone unanswered is fundamental to a determination of novelty over obviousness, and when one of those needs has finally been answered and the answering of it has involved novelty and has evoked an enthusiastic reception, it would be in derogation of the relevant constitutional provision to shove it aside with the conjuncture that obviously any of those who has been working in the related field could have thought of it.

A thorough and careful analysis of the differences between the claims of the '198 patent before this court two years ago and the claims of the patent in Re. 661 which claims were not before the court in the first contest, said claims then being still in the process of prosecution and review before the Patent Office at that time, causes me to conclude, as did the Patent Examiner that the '661 patent involves novelty beyond the concepts not only of the '198 patent but indeed, far beyond the prior art as outlined in the materials of Hess through Yarrington. It is this court's opinion that in this case, wherein plaintiff's analyses of the two patents (see items 34 through 40 of Plaintiff's Proposed Findings of Fact), the whole of which are accepted and adopted by this court as its own and appended hereto, and see plaintiff's analysis of the non-obviousness issue (items 41 through 83 of said findings) are careful, comprehensive and convincing, and in a case in which the burden on the defendant to conclusively establish otherwise has not been within defendant's reach, this court finds for the plaintiff and against the defendant.

The court observes from a review of the language of claim 7 of the patent in suit that it presents a formula vastly different from that of the '198 patent that was before Judge Marshall. The specifications are narrower, they speak to a different composition with a different approach. In fact, they are vastly different from the claims of any of the cited prior art, and as to both the '198 patent and the rest of the prior art they extract from the user a much more severe monitoring of the substance and its application. For example nothing in any of the prior art reaches the composition with as much concern for the combined cleaning capabilities of the specific chemicals and the surfactant for activity during the process for effecting at a very low temperature "water break free" surfaces for both the exteriors and interiors of the aluminum cans. All of this is to be found supported and explained by the expert witnesses and the Patent Office Examiner. There is no question but that the patent in suit here is fundamentally different from and an improvement over the other Binns inventions as well as over any other of the prior art. This position was confirmed not only by the testimony of the exceptionally

qualified experts who appeared for the plaintiff before the court, but also by the statements of the Patent Examiner himself.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Both parties have tendered proposed findings of fact and conclusions of law for the court's convenience. It is the determination of the court that plaintiff's submissions should be adopted by the court as its own. Accordingly they are set forth below.

## FINDINGS OF FACT

1. Plaintiff, Henkel Corporation ("Henkel"), seeks a preliminary injunction restraining defendant, Coral, Inc. ("Coral"), from infringing United States Patent Re. 32,661 (the "'661 patent") by selling a low temperature acid cleaner called Clene 100/ACC–2 and inducing its customers to use such cleaner to remove fines and lubricants from aluminum cans to achieve a water-break-free surface. Both Henkel and Coral manufacture and distribute chemicals for industrial use, including low temperature acid cleaners, which, when used, are covered by the claims of the patent in suit. Henkel is the present owner of all right, title and interest in the '661 patent reissued on May 3, 1988.

2. On April 25, 1989, Henkel filed its patent infringement complaint. Henkel filed a Motion for a Preliminary Injunction on May 26, 1989, which was followed by Coral's Motion for Summary Judgment on July 10, 1989. After briefing was completed, the Court issued a Memorandum Opinion and Order setting an evidentiary hearing on both Motions. The evidentiary hearing was conducted for nine days in February and March 1990. Based on all the evidence presented, the Court determines that a preliminary injunction should issue and that Coral's motion for summary judgment should be denied. The following constitutes the Court's Findings of Fact and Conclusions of Law. Fed.R.Civ.P. 52(a).

## HOW ALUMINUM CANS ARE PRODUCED

3. Before 1960, beverages were packaged in glass bottles or three-piece tin containers, the three pieces being the top, bottom, and side. The aluminum beverage can industry began in the early 1960's, when bottlers and consumers were seeking alternatives to glass and tin containers. A need existed for a light weight yet strong container, which could be manufactured at less expense. Aluminum became the metal of choice, due to its light weight, appearance and strength. A two-piece aluminum can was developed, which increased the speed of production. The "drawn and ironed" aluminum can industry now produces over 80 billion two-piece cans per year (Hr.Tr. 44–45; Stbr.Tr. 191–92).

4. A drawn and ironed or "D & I" two-piece aluminum can is produced from aluminum coil stock. The coil stock is fed into a cupping press where the flat metal is drawn into a shallow cup, using a lubricant to protect the tooling and ensure a smooth surface. The shallow cups travel to a bodymaker, where successive rings draw and iron the cup to a full length can. The bottoms are domed for added strength and a cutter trims off excess aluminum. The entire process is conducted at high speed. Each set of cuppers and bodymakers produces 300 cans per minute (Hr.Tr. 48; Stbr.Tr. 192–96).

5. After drawing and ironing, the can bodies are carried by a mesh belt to a six-stage washer. The belt carries almost 2,000 cans per minute through a spray washer, which removes the drawing and ironing lubricants as well as dirt and small particles of aluminum called "fines". Aluminum fines are created as the metal is mechanically stretched during the drawing and ironing process. In the first wash stage, the cans are pre-cleaned by spraying with water to remove a significant amount of lubricating oil and soil from the metal surfaces. In the second stage, the cans are sprayed with a cleaning solution which completes the removal of lubricating oil and soil and dissolves aluminum fines from the inside and outside of the can. The two

wash stages are followed by rinsing, conditioning, another rinse, and a final deionized water rinse (Hr.Tr. 48–50; Stbr.Tr. 192–96).

6. Following the cleaning stages, the cans move by conveyor to the finishing cylinders. The outsides of the cans are rolled against rubber cylinders which apply decorative paint and protective varnish. A clear sanitary lacquer is then applied to the inside of the cans, and the cans are dried in ovens. Before shipment, the cans are "necked" to provide greater strength and "flanged" to accept a lid after filling (Hr.Tr. 50–51; Stbr.Tr. 192–96).

MAKING THE '661 INVENTION

7. The '661 patent claims the spray composition used to clean the cans in the second wash stage. It is essential that beverage cans be cleaned to a "water-break-free" condition before the application of paint or sanitary lacquer. A water-break-free surface means that rinse water uniformly coats the entire can and sheets off its surface without leaving droplets. If lubricating oils, soil or aluminum fines remain, water will bead, contaminants will dry on the surface, the outside decoration will be discolored, and the inside sanitary coating will have gaps. If the inside protective coating is not uniform, the beverage contacts the aluminum and causes corrosion as well as a "metallic" or "off" taste (Hr.Tr. 52–54; Stbr.Tr. 196–97, 198–200; PX–48 ¶¶ 3, 4).

8. Before the '661 invention, the aluminum can industry used alkaline cleaning solutions and hot sulfuric acid cleaners. Alkaline cleaners proved to be unsatisfactory, due to high cost, ineffective cleaning, and sludge formation which plugged the spray nozzles and caused excessive equipment down time. The alkaline cleaners were replaced by the hot sulfuric acid cleaners, which also had many drawbacks (Hr.Tr. 54–55). Henkel's predecessor, Amchem Products, Inc. ("Amchem"), was the recognized leader in developing compositions to clean and treat metal surfaces. The company was established in 1917, and has continuously served the metal industry since that date. Amchem commercialized the first high-temperature aluminum can cleaning solution in the mid–1960's which contained sulfuric acid, a wetting agent, chromic acid as a corrosion inhibitor, and, in some instances, ammonium bisulfate. This hot cleaner had to be heated to high temperatures, generally 170° to 190°F and above. Without these high temperatures, the cleaning solution was ineffective. There were many problems associated with hot acids for cleaning. High energy costs were required to heat the solution to the operating range and maintain that temperature. The heated solution caused severe corrosion of the spray tanks, plumbing, conveyors, and fire tubes (used to heat the solution). It also posed a great danger to workers from fumes and splash. Although chromates were added to the solution to retard corrosion, chromates were recognized as carcinogens and environmentally hazardous. Waste water had to be treated, raising the operating costs (Hr.Tr. 52–56; Das Tr. 722–23; Stbr.Tr. 207–12, 410; Bdt.Tr. 1141–44; PX–47 ¶ 3).

9. In the late 1960's, Amchem recognized the industry need for a low temperature acid cleaner that eliminated the numerous drawbacks of the hot acid cleaner. In 1967–1968, Andrew Hamilton, an Amchem employee with a Bachelor of Science degree in chemistry and at least five years of metal cleaning experience, sought to invent a low temperature cleaner. Hamilton devised a cleaning solution containing phosphoric acid, sulfuric acid, surfactant, sequestrant, and oxalic or citric acid. A patent issued on this composition, U.S. Patent Re. 27,662 (PX–11). Although Amchem attempted to market the composition, it proved to be ineffective at temperatures below 170°F, and it was shortly withdrawn from the market. Hamilton's attempts and failures are significant. Hamilton's background and experience were totally devoted to metal cleaning. He had at his disposal the resources of Amchem, the industry leader in metal cleaning and treatment. With all of this assistance and knowledge, he still was unable to formulate a commercially acceptable low-temperature acid cleaner. Although Coral contends that it would have been obvious to start experimentation with the high temperature acid

cleaner, Hamilton, illustrative of one skilled in the art, did not follow that approach (Stbr.Tr. 212–14, 410–15; PX–47 ¶ 4).

10. In April 1972, Eric Binns, a former Amchem employee currently working for Coral, was assigned the task of developing an effective low temperature can cleaner. The proposed cleaner, as reflected in Binns' Project Plan dated April 20, 1972 (PX–21), required the following properties:

low operating temperature (120–150°F)

low corrosion of stainless steel equipment

non-chromate

non-sludging

non-dulling to can exterior

economical

can interior free of aluminum fines and smut

water-break free interior and exterior

bright exterior

bath must hold dissolved aluminum in solution; and

forming lubricants must salt out.

The inventor, Binns, his project leader, Ed Rodzewich, and Lester Steinbrecher, then director of Amchem Research and Development, conferred and jointly assessed Binns' chances of success at only 50%. This joint assessment reflected the considered judgment of Amchem personnel with over thirty years' collective experience in the metal cleaning and treating art, each of whom had at least a Bachelor's degree in chemistry (Stbr.Tr. 215–19, 220–22, 416–18; PX–19, p. 112; PX–47 ¶ 5).

11. There are a wide variety of essential cleaning requirements for beverage-quality aluminum cans that are difficult to meet in an effective and efficient way. Binns was confronted with goals that were at odds with each other. A composition which cleans consistently and effectively within an acceptably short treating time and under low temperature conditions must be of high strength. However, such high strength cleaning properties are not consistent with the simultaneous goal of avoiding corrosion and degradation of the aluminum surface and the processing equipment. Conversely, the formulation of a composition which does not attack the pro-

cessing equipment is inconsistent with the goal of performing the cleaning task within acceptable treating times and under low temperature conditions. Similarly, a high-strength composition which does the cleaning job effectively and repeatedly under acceptable time and temperature conditions can cause undue etching of the aluminum surface. Accordingly, in formulating an acceptable cleaning composition, one or more of the desired properties may be achieved, but only at the expense of other desired properties (PX–48, ¶ 4; Stbr.Tr. 196–207).

12. Binns' early efforts, as reflected in his laboratory notebooks (PX–19; PX–20), were directed towards various concentrations and combinations of mineral acids, including sulfuric acid, hydrochloric acid, phosphoric acid, and nitric acid, as well as the Hamilton cleaner and the prior art hot sulfuric acid cleaner. Despite this experimentation, none of these compositions produced effective cleaning at low temperatures. After these failures, in what Binns then characterized as "way out" experiments, Binns added fluoride-containing compounds to a cleaning solution. The addition of fluoride was "way out" because it was known at the time of Binns' work that fluoride ions could rapidly attack and over-etch the aluminum surface. Indeed, at the time Binns proposed the use of fluoride, he also noted that an inhibitor might be necessary to control overetching (Stbr.Tr. 222–27, 231–34, 418–20; PX–19, pp. 159, 162; PX–47 ¶¶ 5, 6).

13. Binns was encouraged by his initial trials with fluoride and he continued to experiment with fluoride in combination with other acids. After much trial-and-error experimentation, which was typical in this art due to a low level of predictability, Binns found that very low concentrations of hydrofluoric acid and sulfuric acid with a surfactant produced remarkable, commercially acceptable results at temperatures between 110 and 130°F (PX–23; Stbr.Tr. 224–27, 227–30).

14. Amchem immediately recognized the importance of Binns' discovery and promptly carried out field tests of the new

low temperature cleaner at commercial plants starting in mid–1973. After successful field trials, Henkel commercialized its "Ridoline" products which Binns had invented. Henkel sells sulfuric acid and surfactant together in a concentrated form, which the customer dilutes to operating concentration. Hydrofluoric acid is sold separately as a concentrate that is also diluted to operating concentration. When this two-part Ridoline product is used as recommended, the cleaning composition falls within at least claim 7 of the '661 patent (PX–23; Hr.Tr. 57–59; Stbr.Tr. 230–31, 251–54).

15. Amchem's new low temperature cleaner was an immediate commercial success. From 1973 to 1983, sales rose from $34,000 to almost $11 million per year. Sales today are in excess of $10 million per year. In the first few years following its introduction almost all aluminum can manufacturers changed from the previous high temperature cleaner to Amchem's new low temperature composition. The product satisfied a long felt need of the industry. As a consequence of the low temperature cleaner's success, the previously employed alkaline cleaners, as well as Amchem's own hot sulfuric acid cleaner, were driven from the marketplace (Das Tr. 723; Hr.Tr. 58–59; Kdl.Tr. 499–506; Stbr.Tr. 231; PX–29 A and B; PX–30 A and B).

16. Binns' developmental work resulted in a highly "fine tuned" composition which unexpectedly has a combination of many properties that enable it to be used commercially in an effective, efficient and economical manner.

## PROSECUTION UNDERLYING THE '661 PATENT

17. To assist the Court in understanding the Patent and Trademark Office ("PTO") proceedings, Henkel presented the testimony of George R. Clark. Clark is a member of the Illinois Bar with outstanding credentials who has participated in hundreds of PTO proceedings and has acted as an expert witness on patent matters before this and other Courts (Clk.Tr. 64–71; PX–13 ¶¶ 1–3; PX–17). Coral presented the testimony of John E. Witherspoon, a member of the District of Columbia Bar with experience as a member of an appellate panel in the PTO. He has testified as an expert witness on patent matters many times. Witherspoon generally supported Clark's explanation of the protracted reissue proceeding (DX–122; Wspn.Tr. 1405–09, 1411).

18. On February 14, 1974, the inventor, Binns, filed a patent application (Serial No. 442, 726) claiming cleaning compositions and processes (PX–2B). Binns assigned the application to Amchem, Henkel's predecessor. The PTO Examiner's first Office Action required a restriction between the cleaning compositions and processes under 37 C.F.R. § 1.142 and 35 U.S.C. § 121. The restriction reflected the PTO's expert determination that "two or more independent and distinct inventions are claimed in a single application." 37 C.F.R. § 1.142. It also reflected the PTO's determination that the composition claims were patentably distinct from the method claims and vice versa (PX–2B, p. 22). Amchem abandoned the 1974 application (but not the inventions disclosed therein) in favor of a continuation-in-part ("CIP") application, filed prior to the abandonment date (Clk.Tr. 82–84; PX–13 ¶ 6).

19. Amchem's CIP application (Serial No. 607,154) was filed on August 25, 1975, and again claimed both cleaning compositions and processes in the single application (PX–2C). Once again, the PTO Examiner held that the compositions were an independent and distinct invention compared with the processes claimed. Restriction was required. Amchem elected to pursue the composition claims in the 607,154 application (PX–2C, p. 29; Clk.Tr. 85–86; PX–13 ¶ 7).

20. After an initial rejection from the Examiner, Amchem amended the claims of 607,154. The Examiner allowed the amended composition claims on September 9, 1976 (PX–2C, p. 57). United States Letters Patent 4,009,115 ("the '115 patent") issued on February 22, 1977 (PX–3; PX–13 ¶ 8; Clk.Tr. 86).

21. On December 30, 1976, before the '115 patent issued, Amchem filed anoth-

er CIP application which was assigned Serial Number 755,929. This application claimed processes for cleaning aluminum surfaces. The 755,929 application became United States Letters Patent 4,124,407 ("the '407 patent"), issued on November 7, 1978 (PX–4; PX–7A; PX–13 ¶ 9; Clk.Tr. 85–86).

22. After Coral representatives notified Amchem's attorneys of prior art not considered by the PTO during the initial prosecutions of the '115 and '407 patents, Amchem filed an application to reissue the '115 patent (composition) on September 23, 1980. This reissue application was assigned Serial Number 189,741 (PX–2D). At the same time, Amchem filed an application to reissue the '407 patent (process), which was assigned Serial Number 189,743. Under the then applicable PTO regulations, a reissue application provided the patentee with an opportunity to have new prior art or other significant facts considered by the PTO. 37 C.F.R. § 1.175 (Clk.Tr. 88–91; Wspn.Tr. 1431–34; PX–13 ¶ 10).

23. The process claims in Serial Number 189,743 reissued first on April 5, 1983, as United States Letters Patent Re. 31,196 ("the '198 patent") (PX–4; PX–7B). On April 12, 1983, Amchem brought a patent infringement action against Coral based on the '198 patent. The '198 patent was held invalid as obvious by Judge Prentice Marshall in a decision dated August 31, 1987 (PX–26). This decision was affirmed by the Federal Circuit in 1988 (PX–27; PX–13 ¶ 11; Clk.Tr. 103–04).

24. While the first suit was pending, the composition reissue application with Serial Number 189,741 was abandoned in favor of a continuation reissue application filed on July 27, 1984, as Serial Number 634,668 (PX–2E). This application continued the prosecution of the composition claims as in Serial Number 189,741 (Clk.Tr. 94–95).

■ 24A. Any time after a patent has issued a patentee may file a reissue application if the patentee believes that the patent is "through error without any deceptive intention, deemed wholly or party inoperative or invalid, by reason of a defective specification or drawing, or *by reason of the patentee claiming more* or less *than he had a right to* in the patent ..." [Emphasis supplied]. 35 U.S.C. § 251. A reissue application prosecution is a corrective proceeding, with one of the express purposes being to reduce the scope of an overclaimed invention—to correct the overbreadth (Wspn Tr. 1459–62; Clk.Tr. 88–90).

25. From 1977 to about 1982, reissue proceedings before the PTO were open to the public. Any member of the public could participate in the reissue proceedings and "protest" the issuance of a reissue patent. During this period, the so-called "Dann Amendments" were in effect. For all applications filed after March 1, 1977, and until the Dann Amendments were revoked, the regulations (37 C.F.R. § 1.291) gave third parties full access to reissue applications and the right to enter written protests against them. Such written protests could include citation of additional prior art or other invalidity contentions, all of which had to be considered by the Examiner. Once the PTO had formally granted the protester access to the reissue application proceedings, the protester was entitled to monitor the proceedings, receive copies of all actions, and file additional papers with the PTO. 977 O.G. 13 (December 12, 1978). Under the Dann Amendments, the Examiner could give a protester the opportunity to comment in writing on the responses to Office Actions submitted by patent applicants, where the Examiner believed the protester could "contribute significantly." 977 O.G. 13 (December 12, 1978) (Clk.Tr. 91–92; Wspn.Tr. 1431–34; PX–13 ¶ 13).

26. The PTO eliminated the opportunity to fully participate as a protester, beyond the submission of an initial written protest, in 1982. Nevertheless, protesters who had filed their protests prior to 1982 and had participated in the reissue proceeding were able to continue their participation if permitted within the discretion of the PTO Commissioner. *See* 1013 O.G. 19 (December 8, 1981) (Clk.Tr. 92–94; Wspn.Tr. 1518; PX–13 ¶ 14).

27. Coral became a protester under the Dann Amendments in the reissue proceedings for the patent in suit. From 1980–1987, Coral made at least fourteen separate submissions relating to the reissue proceedings for the '661 patent. The prosecution history establishes that each of Coral's submissions received consideration by the PTO Examiner. The Examiner throughout the reissue proceedings was Dennis Albrecht, an experienced Primary Examiner with at least ten years' experience in the relevant art at the time he determined Amchem's '661 claims were patentable (Clk.Tr. 92–94; Wspn.Tr. 1433–34, 1445–50).

28. Examiner Albrecht specifically noted in his statement of Reasons for Withdrawal of the Rejections on December 23, 1985, that during the reissue proceedings Coral had "enjoyed a high degree of participation in this prosecution far beyond that sanctioned by current PTO practice and policy" and that Coral "has had more than a fair and adequate opportunity to present his position concerning the patentability of the claims in this case...." (PX–14; PX–2E, pp. 216–17). Coral had the opportunity, knowledge and motive to present all prior art and facts it deemed material to the Examiner for consideration, and Coral took full advantage of that opportunity (Clk.Tr. 92–94; Wspn.Tr. 1440, 1441–45; PX–13 ¶¶ 15, 16).

29. During the hotly contested reissue proceedings, which lasted nearly eight years, the broadest claim, claim 7, of Re. 32,661, was significantly narrowed from the broadest claim, claim 1, of the original '115 patent, by adding the language underlined below:

> 7. An acidic aqueous cleaning solution having a pH of less than 2.0 and consisting essentially of about 1 to about 10 g/1 of sulfuric acid, about 0.005 to about 0.1 g/1 of hydrofluoric acid, and about 0.1 to about 10 g/1 of a surfactant selected from the group consisting of nonionic and anionic surfactants, wherein the sources of said acids are respectively sulfuric acid and hydrofluoric acid, wherein said solution is free of a corrosion inhibitor in a corrosion-inhibiting amount and of a sludge forming material, and wherein said solution is effective in removing and dissolving aluminum fines and in cleaning lubricating oils from the surfaces of drawn and ironed aluminum cans of 3004 alloy at a temperature within the range of about 110°F to about 135°F, said cleaned surfaces being water-break free.

(PX–5; see PX–2E, p. 66). Claim 1, without the underlined limitations, was repeatedly rejected by the PTO. It was only after the underlined limitations were added that the PTO found the now narrowly claimed invention non-obvious. This narrowing of the claims during prosecution better to distinguish over the prior art was a fundamental purpose of reissue proceedings (Clk.Tr. 95, 96–97 PX–13 ¶ 17).

30. Examiner Albrecht thoroughly considered all the prior art (including patents, publications, on sale and public use activities) submitted by Amchem and by two protestors, Hooker and Coral. In his Statement of Reasons for Withdrawal of the Rejections, the Examiner stated:

> As the prior art of record in this case abundantly indicates, many scores—or even hundreds—of different compositions have been used to treat or clean aluminum substrates.

> Many of these have contained sulfuric acid or its acid salts alone or in combination with hydrofluoric acid or fluoride salts. Of the prior art references disclosing solutions containing both sulfuric acid and hydrofluoric acid, none discloses any specific formulations falling within the proportions recited in the present claims.

> When the Examiner began review of the reissue application in late 1981, he was aware that the prior art most closely concerned with removing aluminum fines and lubricating oils from aluminum cans used compositions that were more remote from those claimed than were those disclosed in other references which were directed to different uses.

> The Examiner believed and still believes that an unreasonable amount of hindsight reconstruction and unsuggested

modifications would have been required to arrive at the instant solution's from those used for applicants intended purposes in the prior art.

\* \* \* \* \* \*

Instant inventor Benz [sic Binns] has saved workers in this art the huge amount of trial and error testing they would otherwise have had to do themselves and this merits protection for his invention as it is now narrowly claimed. (PX–14; PX–2E, pp. 215–16; Clk.Tr. 100–03; PX–13 ¶ 18).

31. The PTO carefully considered the patentability of the '661 composition claims in light of Judge Marshall's August 31, 1987 decision holding that the process claims of Re. 31,198 were invalid for obviousness (reported at 5 U.S.P.Q.2d (BNA) 1736, 1987 WL 16627 (N.D.Ill.1987), aff'd mem., 864 F.2d 149 (Fed.Cir.1988)) (Clk.Tr. 108; PX–26; PX–27). All of the art relied on in Judge Marshall's Opinion was considered by the PTO during the '661 reissue proceeding (Compare PX–26 with PX–10A–LL). In his Statement of Reasons for Allowance, dated December 15, 1987, the Examiner noted that "the scope of the compositions used in the method claims of Reissue 31,198 is significantly broader" than the composition claims he had before him (PX–15; PX–2E, p. 305). After reviewing Judge Marshall's decision, the Examiner found: "since the scope of the composition claims in this application is more narrow than recited in the claims of Reissue 31,-198, the District Court Opinion in said litigation is not controlling in the instant application" (PX–15; PX–2E, p. 308). The Examiner then explained at length the various factors supporting patentability. In an "extraordinary" step, Examiner Albrecht also conferred with the PTO's Solicitor's Office to determine what legal effect Judge Marshall's Opinion might have on the narrow composition application. After such consultation and a careful assessment of the significantly narrowed composition claims, the PTO rejected Coral's protests of unpatentability, and the '661 patent issued on May 3, 1988 (Clk.Tr. 110–16, 123;

Wspn.Tr. 1462–68; DX–116, p. 3; PX–1; PX–13 ¶ 20).

32. After Judge Marshall's opinion, Henkel submitted comments of Coral to the PTO although technically Coral could not do so directly. In a November 9, 1987 letter which Henkel submitted to the PTO, Coral asserted that it had been successfully using a non-infringing cleaning composition containing ammonium bifluoride as the source of hydrofluoric acid (PX–16; PX–2E, pp. 304–05; Wspn.Tr. 1519–21, 1523–26, 1534). Coral asserted that this fact demonstrated obviousness but the Examiner disagreed. After the '661 patent reissued, Henkel obtained samples of several Coral products, some of which indicated that ammonium bifluoride was indeed being used to avoid infringement. However, other testing prior to suit demonstrated that Coral was also using hydrofluoric acid as the source of hydrofluoric acid, as well as the other elements of the composition claimed in '661 patent. After this initial uncertainty was resolved and it became apparent that Coral refused to voluntarily abandon its infringement, Henkel filed its Complaint for patent infringement followed by the instant Motion for a Preliminary Injunction (PX–59, ¶¶ 3, 4; PX–47 ¶¶ 7, 8).

32A. The prosecution history of the '198 patent, including all applications underlying the original '407 patent, was not made an exhibit at the hearing. Coral's Proposed Findings 49–51 suggest that a terminal disclaimer was filed in those applications in response to an obvious-type double patenting rejection. Because neither the terminal disclaimer document nor the accompanying patent prosecution papers were presented for consideration, this Court has not drawn the suggested inference sought by Coral. There is no evidence that an obvious-type double patenting rejection even had been made as terminal disclaimers can be filed for various reasons. Even accepting Coral's suggestion, it has no bearing on the patentability of the '661 claims. (Clk.Tr. 148–50)

CORAL'S DEFENSES

33. Coral has raised three primary defenses to Henkel's infringement charges:

(a) Judge Marshall's prior adjudication of the '198 patent allegedly has binding collateral estoppel effect in this proceeding, leaving the Court with no choice except to hold the '661 patent claims invalid for obviousness; (b) in any event, Coral contends that the '661 claims are invalid for obviousness; and (c) Coral asserts that its activities are protectible under the doctrine of intervening rights. With but one limited exception, which was abandoned at the evidentiary hearing and will be addressed later, Coral admits that if the '661 patent is valid, Coral has actively induced infringement of the patent (Das Tr. 763–65, 766–67, 768–69; PX–44; PX–45; PX–46). (*See also* PX–47 ¶¶ 7, 8).

## A. Collateral Estoppel

34. In a 1987 decision, Judge Marshall of this Court held that the '198 claims to a process for cleaning aluminum beverage containers with certain aqueous acidic compositions were invalid. Although the opinion suggests otherwise, 5 U.S.P.Q.2d at 1741, the '661 composition claims presently in suit were not before Judge Marshall. Moreover, any suggestion that the obviousness of the composition claims now present in the '661 patent was decided in that case was held to have been error on appeal (PX–27, p. 5; Clk.Tr. 115–16).

35. To determine whether collateral estoppel should be applied, the Court first examines the differences between the '198 and '661 patent claims. When examined side by side, and as found by the PTO Examiner (PX–15; PX–2E, pp. 306–10), there are substantial and significant differences in claim language between the claims of each patent. This can be illustrated by comparing two claims, one from each patent, and underlining the differences in language (PX–6):

Claim 7 Of The '661 Patent
An <u>acidic</u> aqueous cleaning solution having a pH of less than <u>2.0</u> and <u>consisting essentially of</u> about 1 to about 10 g/l of sulfuric acid, about 0.005 to about 0.1 g/l of hydrofluoric acid, and 0.1 <u>to about 10 g/l of a surfactant selected from the group consisting of nonionic and anionic surfactants, wherein the sources of said acids are respectively sulfuric acid and hydrofluoric acid, wherein said solution is free of a corrosion inhibitor in a corrosion-inhibiting amount and of a sludge forming material, and</u> wherein said solution is effective in removing <u>and dissolving</u> aluminum fines and <u>in cleaning</u> lubricating <u>oils</u> from the surfaces of <u>drawn and ironed</u> aluminum cans of 3004 alloy at a temperature <u>within the range of about 110°F to about 135°F, said cleaned surfaces being water-break free.</u>

Elements Of Dependent
Claim 6 Of The '198 Patent
<u>A process for cleaning an aluminum surface by contacting said surface with</u> an aqueous cleaning solution having a pH of <u>less than 1.8</u> and <u>comprising</u> about 1 to about 10 g/l of sulfuric acid, about 0.005 to about 0.1 g/l of hydrofluoric acid, and a surfactant dissolved therein wherein said solution is effective in removing deposits of aluminum fines and lubricant from the surfaces of aluminum cans of 3004 alloy and the temperature of the spray solution is below 135°F.

The differences underscored above are essentially the same differences that exist between the claims which issued originally in the '115 patent and those which were reissued in the '661 patent. The PTO repeatedly rejected the former as obvious over the prior art, but allowed the latter, thereby again indicating that these differences were patentably significant (Clk.Tr. 95–98, 107–12, 174, 178; Stbr.Tr. 254–55; Ldr.Tr. 437–39, 441; PX–48 ¶ 13).

36. The sole independent claim of the '661 patent, claim 7, claims a composition which has been substantially narrowed in many ways from the compositions described in the method claims of the '198 patent. As limited, claim 7 is specifically directed to removing fines and lubricating

oils so completely from the surfaces of 3004 alloy aluminum cans that the resulting surfaces are cleaned to a "water-break-free" state, thereby distinguishing over lesser cleaning end results. Claim 7 expressly excludes the presence of corrosion inhibitors in corrosion-inhibiting amounts and also expressly excludes components that form sludge. Claim 7 requires that the sulfuric and hydrofluoric acid be added to the cleaning compositions as acids rather than be formed within the cleaning solution such as by adding salts or complexes (Clk.Tr. 97–98, 107–08; Wspn.Tr. 1468–70, 1496–99; Stbr.Tr. 234–50, 254–55; Ldr.Tr. 437–39, 451; Blo.Tr. 1102–07, 1118–19; PX–48 ¶¶ 12, 13; PX–2E, pp. 306–10).

37. In concluding that the prior decision involving the '198 patent was not dispositive of the '661 claims, the PTO Examiner focused on some of these substantial differences:

It should be noted that the scope of the compositions used in the method claims of Reissue 31,198 is significantly broader than the compositions covered by the instant reissue claims. The instant claims require that the sulfuric and hydrofluoric acids in the compositions be derived directly from sulfuric and hydrofluoric acids, and not from acid salts such as sodium bisulfate and ammonia bifluoride. Since such acid salts have sometimes been used in place of sulfuric or hydrofluoric acids in some contexts, the claims of Reissue 31,198 would be construed as covering such acid salts whereas the present claims do not. The claims of this case also differ from the scope of those in Reissue 31,198 in that the instant claims exclude the presence of corrosion inhibitors (e.g., chromium compounds), whereas the claims of Reissue 31,198 do not.

Since the scope of the composition claims in this application is more narrow than recited in the claims of Reissue 31,198, the District Court opinion in said litigation is not controlling (PX–15; PX–2E, pp. 306–10; Clk.Tr. 108–12).

38. Coral has argued that some of the '198 dependent claims contained limita-

tions such as the source of the acids being the acids *per se*. Coral also contended that, by implication, both corrosion inhibitors and sludge forming constituents were excluded. There is no evidence that Judge Marshall considered the '198 claims as so limited. Equally important, the Court agrees with the PTO that no such limitations can be read into the '198 claims. For example, dependent claims in the '198 patent reciting the addition of acids during replenishment (e.g., claims 11 and 13), still permitted acid salts to be used in the make-up bath (Das Tr. 945–46; Stbr.Tr. 360–63, 365; Wspn.Tr. 1491–92, 1496–99).

38A. Contrary to the arguments now being made by Coral, in a post trial submission to Judge Marshall in connection with the proceedings on the '198 patent, Coral argued that the '198 patent process claims were, "substantially broader" than the then allowed '661 patent composition claims. Coral listed the extensive limitations not present in the process claims that were added to the composition claims as follows:

... the composition claim ('661) has been construed by Amchem's counsel to exclude all acid salts. The process claim before this court ('198) does not exclude acid salts and there is no prosecution history estoppel (file wrapper estoppel) to that effect.

The composition claim is limited in temperature; the process claim is not. The composition claim is limited to drawn and ironed aluminum cans, surfactant concentration range, and the absence of specified materials; the process claim is not.

The extensive limitations that were added to the composition claim in order to secure allowance are not present in the process claim. Accordingly, the process claim should be held obvious over the prior art.

(PX–57, pp. 5–6).

39. Based upon the differences in claim language, and observing these differences in relationship to the invention as a whole and the prior art, the Court finds no substantial identity between the '661 patent

claims and those of '198. Collateral estoppel does not apply.

40. Coral also argues that Judge Marshall's factual findings, made when considering the '198 method patent, are binding on Henkel, and must be applied equally to the narrowed '661 composition claims. However, Judge Marshall's findings necessarily were based on the substantially broader composition definition found in the process claims he considered. The restrictions newly added to the '661 claims change the relationship between what the '661 patent claimed and what was disclosed in the prior art, in several instances expressly excluding essential elements from the prior art compositions while requiring that the cleaning solution meet the highest standards of a water-break free surface. Because of these new and significant restrictions, this Court must reassess the scope and content of the prior art, the skill of those working in the art as applied to the specific objectives of the claims, and the obviousness or non-obviousness of the now defined invention as a whole. It is not proper, as Coral urges, to consider merely the obviousness or non-obviousness of the new limitations. The findings of Judge Marshall might be binding if the '661 claims were insignificantly changed from the '198 claims, but that is not the case here, so new factual findings must be made (Wspn.Tr. 1478–79; Stbr.Tr. 254–55, 261–64, 355–56; Das Tr. 944–48; Ldr.Tr. 437–39).

## B. Non–Obviousness

41. The Court must now determine whether Coral has presented evidence establishing obviousness of the '661 claims as a whole under the Graham v. John Deere factors. This assessment must be made keeping in mind the exhaustive protested reissue proceedings, the heavy burden of proof arising from the presumption of validity, and Coral's failure to cite any new prior art not considered by the PTO.

42. Henkel presented the expert testimony of Dr. Henry J. Leidheiser, Jr. and Mr. Lester Steinbrecher to assist the Court on the issue of non-obviousness. Both of Henkel's experts were well-qualified to testify concerning the level of ordinary skill in the art and the bearing each prior art reference has upon the obviousness or non-obviousness of the claims in the '661 patent. Leidheiser was Chairman of the Lehigh University Chemistry Department and Director of the Zettlemoyer Center for Surface Studies, Corrosion Laboratory. The Center conducted research and development work in all areas relating to metals and metal treatment. Leidheiser has worked in the area of metal surface treatments continuously since 1945, which has included aluminum and its alloys. Throughout his career, he has worked with and developed many types of metal cleaners, cleaning processes, and treatments (PX–18; Ldr.Tr. 432–36).

43. Steinbrecher started in 1958 as a bench chemist working with metal cleaning and coating processes. He dedicated his career to metal cleaning and treatment, becoming Director of Research and Development for Amchem in 1970. Throughout his more than thirty years in the metal treatment field, he supervised and directly participated in the development of many inventions. Steinbrecher holds over twenty United States patents relating to metal treatment. He is currently Senior Technology Advisor of Henkel (Stbr.Tr. 180–89; PX–47 ¶¶ 1, 2).

44. By contrast, on the question of obviousness or non-obviousness of the claims in the '661 patent, Coral presented testimony of Dr. Fred Basolo, a Professor of Chemistry at Northwestern University and Dr. Narayan Das, a Vice President and Research Director at Coral. While Basolo is well qualified as an expert in chelating agents and coordination chemistry, Basolo readily and repeatedly admitted that he was not skilled in the art to which the '661 patent is directed. He has no training or experience whatsoever in the field of metal cleaning or treatment (Blo.Tr. 1038–47, 1080–81). While Basolo could testify on certain basic reactions between aluminum and acids, he clearly was not qualified as an expert in the area to which the invention claimed in the '661 patent is directed (Blo.Tr. 1007, 1014, 1025–31, 1039, 1047,

1082–83, 1087–91, 1106–08, 1112–13; DX–120; DX–120A; DX–149; DX–150).

45. Das obtained his PhD. in chemistry from Lehigh University in 1972, under the supervision of Dr. Leidheiser. Das began working in the field of metal treatment in 1973 at Amchem, where he developed conversion coatings and not cleaning compositions. Das holds an executive position at Coral, and he considers himself a loyal employee doing as much as possible to avoid a preliminary injunction against Coral which would impact directly on him. Das' testimony regarding the prior art particularly reflected his bias. When confronted with express wording in prior art patents at odds with his broad interpretation of the art's impact, Das repeatedly retreated into nebulous and insupportable allegations that one skilled in the art would ignore such wording. This, plus Das' refusal to answer questions directly on cross examination, seriously undercut his credibility (Das Tr. 528, 530–33, 715, 720–21, 784–85, 799–804, 877–83, 895–901, 904–08; Ldr.Tr. 435; DX–121).

45A. The inventor, Mr. Binns, now a Coral employee, did not testify during the hearing before this Court. Instead, Coral submitted an affidavit. The Court has accorded very little weight to this affidavit because it is in the nature of an inventor repudiating his inventor's oath. (DX–123).

45B. Due to lack of training in patent law inventors may erroneously believe an invention "obvious" when that invention is not legally obvious. (Wspn.Tr. 1427–29).

46. The Court finds that the testimony of both Henkel witnesses was credible and convincing. Based upon all the evidence, including their testimony, the admissions of Coral's witnesses, and the Court's review of the prior art, the Court finds that Coral cannot establish the invalidity of the '661 patent claims by clear and convincing evidence.

47. Coral relies upon four prior art references, Grunwald (U.S. Patent No. 3,140,-203), Yarrington (U.S. Patent No. 3,728,-188), Mickelson (U.S. Patent No. 3,510,430) and an article by Hess on surface treat-ment of specific aluminum products prior to spot welding (PX–8A–D; DX–108–11). Dr. Das spent much of his testimony on direct compiling a chart, selectively picking and choosing particular portions of these four references to the exclusion of all other teachings therein to allegedly recreate the '661 patented invention. These same four references were relied on by Judge Marshall in the earlier litigation between Amchem and Coral, and were known to and fully considered by the PTO when it allowed the '661 patent. The Court finds that none of these references, whether taken alone or in combination, renders the claims of the '661 patent obvious. Nothing in these references motivated or directed one skilled in the art to select or combine them in the manner required to arrive at the claimed compositions (Das Tr. 788–90, 992–93; Ldr.Tr. 442–43, 480–83, 484–85; PX–48 ¶¶ 5, 11; DX–142A).

48. The 1944 Hess article discussed the treatment of selected aluminum surfaces prior to spot welding (PX–8A). Many trials were conducted on a variety of compositions in an effort to find the best room temperature treatment for an aluminum composite then used for airplane parts (called ALCLAD 24S–T) (PX–8A, p. 417; Table 1, p. 418). After all of these tests, the most suitable solution Hess found for this purpose contained a combination of hydrofluosilicic acid ($H_2SiF_6$) and a wetting agent (Solution No. 14 in Hess Table 1, see p. 434, Summary 1). Some tests using sulfuric acid and sodium fluoride at selected concentrations were reported (Solution Nos. 10–10c in Table 1), and the use of hydrofluoric acid alone was also mentioned (Solution No. 18 and p. 419). Nonetheless, for Hess' purposes, only Solution No. 14 was recommended for use with ALCLAD 24S–T. All the other compositions tested proved deficient in several important respects (pp. 419–21 and 425–26). Overall, the Hess article evidences the trial and error method of research typical for the metal treating art and establishes the empirical, rather than predictable, nature of research in this field (Stbr.Tr. 265, 267–72, 273–77, 405–06; Das Tr. 902–07, 918–23; Blo.Tr. 1091–93; PX–48 ¶ 7).

49. The Hess article has different objectives and different criteria for success than the invention claimed in the '661 patent. Hess strives to improve spot welding and measures success by low surface electrical conductivity (PX–8A, pp. 417–18). By contrast, in the '661 patent, highly cleaned aluminum can surfaces are the objective and "water-break-free" surfaces are the criteria. Coral's witnesses attempted to bridge the gap between Hess' specific objectives and '661's water-break free surfaces by contending that any cleaned aluminum surface is necessarily water-break-free. However, the credible evidence establishes that in the aluminum treatment field (as in common, day-to-day experience), cleaning is a relative operation, and not all cleaned aluminum surfaces are water-break-free (Das Tr. 728–31, 743–45; Stbr.Tr. 266–67; Ldr.Tr. 448–49).

50. In fact, Hess does not teach that the oxide removing solutions of interest to him have any cleaning function even though acids and surfactants are employed. Indeed, Hess' teaching is that prior to application of his deoxidizing solutions, precleaning is extremely important, and it is carried out to achieve a water-break free surface (PX–8A, pp. 418, Step 1 and 432, Step 3). Because Hess starts with aluminum surfaces which are already water-break free, he teaches the art nothing about the ability of his oxide removing solutions to provide such surfaces for aluminum cans coated with lubricating oils, dirt and aluminum fines. Hess takes substantial pains to distinguish his oxide removing solutions from cleaners and degreasers (p. 418, "Procedure") (Das.Tr. 908–10; Blo.Tr. 1109; Stbr.Tr. 265–68, 405–06).

51. The Hess article does not disclose or suggest the compositions claimed in the '661 patent. There are many significant differences including the following. First, the purpose of Hess' oxide removing solutions is different from Binns—preparation of surfaces of certain aluminum airplane parts for spot welding, rather than cleaning of 3004 aluminum alloy beverage cans to a water-break free surface (PX–8A, p. 417). Second, Hess does not describe a solution made from hydrofluoric acid in combination with sulfuric acid (PX–8A, p. 418, Table 1; Das Tr. 926–28). Third, in compositions combining sulfuric acid with a fluoride salt, the concentrations of the components in acceptable solutions are significantly different. The sulfuric acid concentration is about 80% greater than the 1 to 10 g/1 of sulfuric acid claimed in the '661 patent (PX–8A, Table 1, Solution No. 10A). The fluoride concentration, added as sodium fluoride which would form sludge in cleaning compositions for aluminum cans, is also greater than the claimed range for hydrofluoric acid. Although Das directed the Court's attention to one Hess composition where the fluoride content was within the '661 claim limits (Solution No. 10A), he admitted on cross examination that he could do so only by pointing to a composition which Hess expressly found to be unacceptable. Thus, higher fluoride concentrations are required by Hess (PX–8A, p. 419, Fig. 6). Fourth, Hess describes a multitude of ingredients in specified concentrations, with no direction how to recombine them to make new effective cleaners for 3004 aluminum alloy beverage containers (Das Tr. 909–18, 921–25, 926, 928–32; Stbr.Tr. 265–67, 268–72, 273–77; Blo.Tr. 1086–87, 1106–08; PX–48 ¶ 7).

52. The Hess article actually teaches away from the use of hydrofluoric and sulfuric acid. Although a sulfuric acid, fluoride salt combination is taught for ALCLAD 24S–T, it is stated to have several drawbacks such as critical concentrations, milky deposits and monitoring problems (PX–8A, p. 419). It is not the treatment of choice for ALCLAD 24S–T (PX–8A, p. 417). When any of the low temperature compositions taught by Hess are used on an aluminum alloy surface (bare 24S–T) as opposed to pure aluminum (ALCLAD 24S–T), they are all "unsatisfactory" (PX–8A, p. 434, Summary 7). By contrast, the '661 claims all require treatment of an aluminum alloy (Das Tr. 923–25, 928–32; Blo.Tr. 1099–1100).

53. When an aluminum alloy is treated, the only composition Hess found to be satisfactory was a high temperature nitric acid composition which is unacceptable for

the '661 purpose (PX–8A, p. 434, Summary 7). Additionally, Hess teaches away from lower concentrations of hydrofluoric acid and sulfuric acid. Hess states that the hydrofluoric acid concentration derived from sodium fluoride cannot drop below 0.24 g/1 "without danger of mistreatment" of the aluminum surface (PX–8A, p. 419). By contrast, in the '661 patent, the highest amount of hydrofluoric acid claimed is 0.1 grams per liter, a substantially lower concentration (Stbr.Tr. 270–72, 274–77; Das Tr. 929–32, 994–95).

54. The differences between the compositions claimed in the '661 patent and the Hess disclosure present new issues not decided with respect to the '198 patent. For example, while Hess disclosed solutions which contain hydrofluoric acid, Hess specifically taught that the use of hydrofluosilicic acid (Solution No. 14) was preferred, and Hess warned against the use of hydrofluoric acid (PX–8A, p. 418, Solution Nos. 14 and 18, and p. 419). In the '198 patent, the source of the hydrofluoric acid in solution was not limited to hydrofluoric acid itself and the claims were broad enough to read on hydrofluoric acid produced within the cleaning composition by the addition of the preferred compound in the Hess article—hydrofluosilicic acid. In the present case, however, the claims of the '661 patent are limited to adding hydrofluoric acid as the source of hydrofluoric acid and thus exclude Hess' hydrofluosilicic acid. Furthermore, the '661 claims expressly exclude sludge forming agents whereas the '198 claims did not. Sodium fluoride as proposed by Hess would form sludge. Lastly, the '198 claims did not require cleaning to a water-break free surface condition, whereas the '661 claims do (Das Tr. 921–22, 943–48; Blo.Tr. 1086–87, 1106–08; Stbr.Tr. 267, 272–73).

55. Grunwald, which issued in 1964, twenty years after Hess, discloses that a strong oxidizing agent called a persulfate should be added to a sulfuric acid solution to produce a deoxidizing and desmutting solution for aluminum (PX–8B; DX–108, col. 1, lines 50 et seq.). The persulfate, an essential ingredient in Grunwald, must be present in large amounts because persul-

fate is reduced to sulfate as it reacts with aluminum or alloying elements of aluminum that comprise smut (PX–8B, col. 2, lines 7–22). Grunwald teaches that no source of fluoride is used except in a special situation where the aluminum alloy contains silicon in the amount of 1% or more (PX–8B, col. 2, lines 1–6; col. 3, lines 18–25). In that case, and that case only, Grunwald suggests the addition to the persulfate/sulfuric acid composition of about 0.067 to 13.2 g/l fluoride ion, derived from ammonium bifluoride or other "inorganic fluoride" (PX–8B, col. 3, lines 38–39). The broad reference to "inorganic fluoride" would include scores of different inorganic fluorides, and hydrofluoric acid is never mentioned (Das Tr. 799–804, 806–08; Stbr.Tr. 277–82, 283; Ldr.Tr. 444; PX–48 ¶ 6).

56. The Grunwald reference is very different from the inventions now claimed by Binns. There is no disclosure in Grunwald of the combination of hydrofluoric acid, sulfuric acid and surfactant as claimed in the '661 patent. Persulfate, an ingredient not mentioned by Binns, is essential to Grunwald (PX–8B, col. 1, lines 70 et seq.). Hydrofluoric acid is not used by Grunwald and sulfuric acid is not required. The concentrations of fluoride ion and sulfuric acid in solution are much greater than the concentrations of these ions in the resultant Binns solutions (Das Tr. 808, 809–10; PX–8B, col. 3, lines 28–31). The purpose of Grunwald is different as well. Grunwald is not a cleaner for aluminum cans, much less of 3004 aluminum alloy, and it does not disclose removal of lubricants, soils and fines to achieve a water-break free surface (Das Tr. 791–94; Stbr.Tr. 282–83). Grunwald was not intended for spray application so there is no recognition of the importance of sludge free solutions. Grunwald teaches the use of salts of both sulfuric and hydrofluoric acids that will form harmful sludge in the type of cleaning bath claimed in the '661 patent (Stbr.Tr. 277–83; Blo.Tr. 1086–87, 1106–08; Ldr.Tr. 444; PX–48 ¶ 6).

57. The teachings of Grunwald also led those skilled in the art away from the Binns invention. The use of fluoride was

proposed by Grunwald only when the treated aluminum alloy contained a considerable amount of silicon (PX–8B, col. 3, lines 18–25). 3004 aluminum alloy, to which the '661 claims are limited, is not such an alloy because it contains no silicon. Looking at Grunwald, one would not believe that fluoride is needed when 3004 aluminum alloy is involved. Further, Grunwald did not specifically teach the use of hydrofluoric acid, but employed instead fluoride derived from ammonium bifluoride or other inorganic fluoride (PX–8B, col. 3, Example 4). Binns went contrary to this teaching (Stbr.Tr. 281–82, 283; Das Tr. 799–804; PX–48 ¶ 6).

58. The differences between the compositions as claimed in the '661 patent and the Grunwald disclosure present new issues not decided with respect to the '198 patent. Grunwald did not disclose a sulfuric acid/hydrofluoric acid combination where the source of the acids were the acids *per se*. In the '661 patent, the source of the hydrofluoric acid in solution is now limited to hydrofluoric acid. It cannot be ammonium bifluoride or other inorganic fluoride as used by Grunwald. These sources of fluoride would have been covered by the '198 patent claims but are expressly excluded now. Moreover, the '661 claims require cleaning to a water-break free surface and exclude sludge forming agents, limitations not found in the '198 patent but which further distinguish over Grunwald (Stbr.Tr. 282–83; Das Tr. 943–48; Blo.Tr. 1086–87, 1106–08).

59. The 1970 Mickelson patent discloses aluminum desmutting and deoxidizing compositions containing specific amounts of ferric sulfate, alkali metal bisulfate, alkali metal nitrate, and alkali metal silicofluoride (PX–8C; DX–109, col. 1, line 64—col. 2, line 11). A surfactant can be added. Mickelson's compositions are not intended for use on 3004 aluminum alloy to clean the surface of such alloy to achieve a water-break free surface. This is most clearly found in Mickelson, col. 3, lines 30–35 and 72–73, and col. 4, lines 17–18 and 53–54, where Mickelson describes as his first step precleaning the aluminum surfaces to remove dirt and grease before application of Mick-

elson's compositions. While a combined cleaning-deoxidizing solution is suggested, it operates at high temperatures and long contact times not feasible for the '661 can-cleaning purpose (col. 4, lines 70–75; Das Tr. 819–20, 823–24; Blo.Tr. 1097–98; Stbr.Tr. 284–85, 406–08; Ldr.Tr. 444–46; PX–48 ¶ 8).

60. The Mickelson reference is very different from Binns. All of the Mickelson ingredients are essential e.g. (col. 2, lines 36–40). Mickelson does not use hydrofluoric acid or sulfuric acid as the source of these acids in solution. Instead, Mickelson's patent specification reads: "Although other fluorides were tried in the compositions as substitutes for the silicofluorides, none of them were found to be satisfactory" (PX–8C, col. 2, lines 28–30). Thus, Mickelson taught that an alkali metal silicofluoride is essential and cannot be replaced with hydrofluoric acid. Moreover, the major component of the Mickelson compositions is ferric sulfate. The main idea of Mickelson is that ferric sulfate and alkali metal nitrate are substituted for chromic acid used in prior desmutting and deoxidizing compositions to avoid attack on the aluminum (PX–8C, *e.g.*, col. 2, lines 36 *et seq.*). The nitrate overcomes "pitting," another term for corrosion. Ferric sulfate and alkali metal nitrate are corrosion inhibitors, now expressly excluded by the '661 claims. The high level of alkali metal in Mickelson's solutions will cause sludge which excludes those materials from the '661 claims (Stbr.Tr. 287–88; Blo.Tr. 1086–87, 1106–08). Basically, the '661 claims eliminate all of the ingredients Mickelson indicated were essential. In fact, not a single ingredient required by Mickelson is now permitted within the '661 claims (Stbr.Tr. 285–88; Das Tr. 586, 825–34, 836; Blo.Tr. 1097–98; Ldr.Tr. 444–46; PX–48 ¶ 8).

61. Mickelson also does not teach that the high concentrations disclosed could or should be lowered to the levels claimed in the '661 patent. In Mickelson's working examples, the concentrations of acids in solution are well above the maximum permitted by the '661 claims (PX–8C, *e.g.*, col.

**1304**

5, Example 3). One would not be motivated to use lower acid concentrations following Mickelson's teaching. Thus, Mickelson differs in ingredients, concentrations and results (Das Tr. 827–30; Stbr.Tr. 287).

62. The differences between the compositions as claimed in the '661 patent and the Mickelson reference present new issues not decided with respect to the '198 patent. Most significantly, the claims of the '198 patent, which included corrosion inhibitors, sludge forming materials and acid salts, would have embraced the essential ingredients of Mickelson. The '661 claims are drawn to exclude every one of those ingredients and additionally require that the cleaner provide water-break free surfaces—another limitation not met by Mickelson (Das Tr. 830–39; Stbr.Tr. 285–88; Blo.Tr. 1097–98).

63. Yarrington issued in 1973 and discloses a deoxidizer and desmutter solution that is an improvement over both the Grunwald and Mickelson compositions (PX–8D; DX–10; col. 1, lines 50, 67–72). The Yarrington compositions are not aluminum cleaners, and Yarrington specifically requires that the aluminum surfaces be precleaned in a separate step prior to use of his compositions (col. 7, lines 32–43). Regarding Grunwald (PX–8B), Yarrington eliminates Grunwald's persulfate and employs instead as essential ingredients ferric ion, thiourea, and fluoride with an optional wetting agent (PX–8D, col. 2, lines 62 *et seq.*). Yarrington teaches that chromate is not needed to inhibit corrosion if ferric ion and thiourea are present as a substitute. At column 4, lines 19–31, it is explained that the ferric ion and thiourea are essential (see also col. 3, lines 43–68 and col. 10, lines 31–35) and there is repeated reference throughout the patent to the "interaction" of the specified constituents in the amounts specified (*et seq.*, col. 7, lines 58–72) in order for the composition to function. The ferric ion significantly inhibits the deoxidizing solution from etching and pitting the aluminum surface (PX–8D, col. 3, lines 50–51). Ferric ion thus acts as a corrosion inhibitor. Thiourea is a complexing agent and it also is a known corrosion inhibitor; it prevents the metal ions from depositing

out onto the metal surface (PX–8D, col. 3, lines 60–67 and 73–75 and col. 4, lines 11–18). These essential ingredients in Yarrington are not presented in the claimed Binns compositions. Binns eliminated the need for a corrosion inhibitor and expressly excludes it from the '661 claims (in a corrosion-inhibiting amount) (Das Tr. 843–46, 856, 877–84, 894–97, 898–901; Stbr.Tr. 289–92, 293, 408; Ldr.Tr. 446–48; PX–48 ¶ 9).

64. Yarrington's compositions also function differently with respect to the added acid. Unlike the '661 patent, in Yarrington the mineral acid is not consumed and no replenishing is required (col. 2, lines 33–36; col. 3, lines 33–37; col. 6, lines 71–74). Yarrington suggests generally that any mineral acid may be added to adjust the pH of the whole composition to within the range of 0.1 to 1.8. Sulfuric acid, an essential ingredient in '661, is only one of many mineral acids for this purpose in Yarrington (col. 7, lines 4–10; col. 9, lines 31–34) (Das Tr. 884, 885–89, 894–95, 896–97).

65. Hydrofluoric acid is one of the suggested fluoride generating components, but either acid or salt may be used indiscriminately (col. 7, lines 72–75). The important teaching of Yarrington is the addition of the ferric ion and thiourea. In one example, where the acids are found in solution with Yarrington's essential ferric and thiourea ingredients, the sulfuric and hydrofluoric acid concentrations are nearly five times greater than the maximum concentration claimed in the '661 patent (PX–8D, col. 5, lines 45 *et seq.*) (Das Tr. 877–83, 890–91; Stbr.Tr. 293–94; PX–48 ¶ 9).

66. The differences between the compositions claimed in the '661 patent and the Yarrington disclosure present new issues not decided with respect to the '198 patent. The '198 patent claims would have covered the additional essential ingredients of Yarrington whereas the '661 claims now specifically exclude them. The '661 patent is narrowly drawn to an aluminum cleaning composition of hydrofluoric and sulfuric acids with a surfactant and without corrosion inhibitors or sludge formers. Moreover, the '661 claims require cleaning to a water-break free surface whereas Yarrington

does not even teach a cleaning composition. In Yarrington, pre-cleaning to remove oils, grease and dirt is required as a separate step for every disclosed composition even if that composition contains a surface active agent (col. 7, lines 31–50) (Das Tr. 856, 884, 943–48; Stbr.Tr. 289, 291–92, 293).

67. Grunwald, Mickelson and Yarrington each disclosed deoxidizing and desmutting compositions, and in each instance these references employed a strong oxidizing agent. Such oxidizing agents are not required in the '661 compositions. Smut, as the term is used by Grunwald, Mickelson and Yarrington, is a special form of deposit formed on aluminum surfaces after alkaline cleaning. This type of smut is not the same as aluminum fines, lubricating oils and other shop dirt which are cleaned from aluminum surfaces by the '661 compositions (Ldr.Tr. 442–444, 445–46, 447–48; Das Tr. 759, 795–96, 812, 825, 845; Stbr.Tr. 278–81, 284–85).

68. Although Yarrington issued some thirty years after Hess was published, and although it sought to improve on the intervening art, its composition was even further removed from those claimed in the '661 patent. The art simply did not develop along the path later taken by Binns and this is strong evidence of non-obviousness (Stbr.Tr. 294–95). Binns produced a successful and commercial product, whereas none of the prior art relied on by Coral was successful for use in cleaning 3004 aluminum in the real world of commerce (Das Tr. 793–94, 821, 844, 938–40).

69. When he made his invention, Binns was trying to develop a low temperature aqueous acidic aluminum can cleaner that would remove lubricating oils, soil and aluminum fines so completely that a waterbreak free condition on the can surface was achieved. The cleaner could not contain chromate and could not sludge, yet it would clean efficiently, quickly, and with no unacceptable etch or corrosion to the aluminum surface or processing equipment. The only art of record directly concerned with this same problem was (a) the "hot" sulfuric acid cleaner which preceded Binns and was the problem facing Binns rather than the solution (see the hot acid cleaners described in the specification of the '661 patent; PX–1, col. 1, lines 34 *et seq.*); and (b) the Hamilton patent (PX–10Q), which is a phosphoric acid, sulfuric acid, surfactant, and sequestrant cleaning solution having no commercial utility. Even Coral does not rely on Hamilton as prior art here (Stbr.Tr. 295–96; PX–47 ¶¶ 3, 4, 5).

70. At trial, Coral attempted for the first time to rely on the hot sulfuric acid cleaner as prior art. Coral's Das said this cleaner was an important element of his obviousness conclusion and another Coral witness, Bendert, made various wholly undocumented assertions regarding the use of this cleaner. Coral never asserted the hot sulfuric acid cleaner as prior art, either before Judge Marshall or before the PTO during the protested reissue (Wspn.Tr. 1451–59). The record is clear that the PTO examiner was aware of this cleaner, but the PTO did not apply it as prior art in any rejection. The hot sulfuric acid cleaner does not assist Coral's obviousness assertions, and Coral's belated decision to rely on that cleaner can be viewed only as an implicit admission of the weakness of the remaining art (Das Tr. 770–72, 992–93; Stbr.Tr. 425–26; PX–1, col. 1, lines 34–62; PX–2E, p. 96 ¶ 2).

71. Coral also asserted for the first time at trial that the prior art employed a hot sulfuric acid cleaner without chromate. This caused excessive corrosion, and there is no credible documented evidence that such a cleaner was publicly used any place. As before, Coral never relied on this purported chromate free cleaner in any of its prior attempts to invalidate Henkel's patents, and its citation now simply evidences desperation (Bdt.Tr. 1149–52, 1209–10; Wspn.Tr. 1438–40, 1441–44, 1451–59).

72. The literature and patent references upon which Coral relies were not concerned with Binns' problem. Grunwald, Mickelson and Yarrington all were directed to deoxidizing/desmutting the surface of aluminum. Hess concerned surface treatment prior to spot welding. None of these references was concerned with removing oils and dissolving aluminum fines from the

surfaces of 3004 aluminum cans to achieve a water-break free condition, and none of the references refer to any such problem, much less a solution to it (Das Tr. 790–92, 819–20, 843–44, 846, 902–09, 917–18; Stbr.Tr. 295–96; PX–48 ¶¶ 5, 11).

73. The claimed '661 aluminum can cleaner is sludgeless and is free of sludge forming ingredients. Even though the solutions are continuously used over long periods of time, they are not prone to sludge-formation. Many of the essential components of the references relied upon by Coral, however, are sludge forming materials. In Hess, the sodium fluoride suggested as a source of fluoride is a sludge forming material. Sodium ions precipitate with the aluminum to form cryolite. The alkali metal salts in Mickelson will sludge in solution. In Grunwald, many of the inorganic fluorides are known to form sludge (Stbr.Tr. 296; Blo.Tr. 1086–87, 1106–08).

74. The claimed '661 aluminum can cleaner is free of corrosion inhibitors in a corrosion-inhibiting amount. Yarrington, Mickelson and Grunwald all contained corrosion inhibitors as essential ingredients. Coral asserts that if no corrosion occurs then it is obvious not to use a corrosion inhibitor. But, there was no teaching in the art that corrosion inhibitors could or should be eliminated, or if they were deleted, how one could control corrosion—the prior art obviously believed such inclusion was critical (Das Tr. 795, 810–14, 833–34; Stbr.Tr. 296; Ldr.Tr. 438, 451, 474; PX–48 ¶ 11).

75. In metal cleaning and metal treatment, it is difficult to predict what effect varying the identity and concentrations of components in a solution will have on the cleaning. This is a very empirical field. Merely because certain broad, simplified chemical reactions were recognized, this does not mean that the discovery of a workable cleaning solution is easy. The components in the cleaner react and interact in solution with themselves and, in use, with the soil, lubricants and metals present (see generally, Blo.Tr. 1087–89; Ldr.Tr. 440–41, 448). Binns' combination of ingredients was fine-tuned over months of effort. The *minimum* and effective acid concentrations disclosed in the references relied upon by Coral are all much greater than the concentrations claimed in the '661 patent. These selected references taught away from the combination and concentrations claimed in the '661 patent (Das Tr. 734–36, 741, 827–30, 890–91, 926; Ldr.Tr. 440, 480, 482–83).

76. Absent hindsight, one would not be directed to choose the references upon which Coral relies to the exclusion of all the other teachings in the art at that time (see generally PX–9 and PX–10). There are thirty or more references cited by the PTO and they disclose many different metal treatments with compositions having many different ingredients. There are an immense number of combinations and permutations in the prior art with conflicting teachings as to what is critical and what is not (Stbr.Tr. 255–59, 298–99; Ldr.Tr. 442–43, 480–83, 484–85; Das Tr. 779–81). Many references required particular ingredients, and those skilled in the art would not ignore such teachings. Even assuming that one were led to the specific art on which Coral relies, these four references do not suggest a manner of combination to arrive at the specific invention claimed in the '661 patent. Conceding the weakness of Coral's position, Coral's expert, Basolo, suggested that one might "start with" the compositions in these references when seeking to solve the problem Binns solved (Blo.Tr. 1056). Coral could not explain, however, why Yarrington, which references the earlier Mickelson and Grunwald patents, is equally far removed from the '661 compositions (Stbr.Tr. 294–95). The art simply did not develop toward the '661 composition and the references do not teach that "essential" ingredients might be left out or that "minimum" concentrations could be substantially lowered.

77. Coral points to the development of a low temperature cleaner by Parker sometime in the mid–1970's as evidence of obviousness. However, whatever Parker developed, it was later in time than Binns, and there is no credible evidence showing what Parker did or that its development was

independent of Amchem's low temperature cleaner (Bdt.Tr. 1157–59, 1162–67; PX–9H).

78. Were there any doubt regarding the issue, secondary considerations existing here firmly establish that Coral cannot carry its burden of proof on obviousness. The aluminum can manufacturing industry had a long-felt need for a low temperature cleaner. John Harsma, a former Amchem employee whose sales career followed cleaner sales to the can industry, testified that the major manufacturers were pressing Amchem to develop an alternative to the high temperature cleaner. The need was always present and reached serious proportions with the energy crisis of the early 1970's, when the cost of heating cleaning solutions to operating range skyrocketed (Hr.Tr. 55–57; Wspn.Tr. 1479–85; PX–9H, col. 1, line 45).

79. Although the patent literature is filled with proposals representing great efforts to develop aluminum cleaners, none were successful for Binns' purposes. Amchem's early attempts at developing a low temperature cleaner that could be marketed were unsuccessful (Stbr.Tr. 212–14; PX–47 ¶ 4).

80. The '661 composition was immediately recognized as the long sought-for answer. Harsma testified that after the initial field trials, Amchem's product was an immediate success and "spread like wildfire". In the first ten years of introduction, yearly sales climbed from $34,000 to over $10 million. Sales continued to climb through the 1970's. During the first decade of introduction, almost all aluminum can manufacturers switched to Amchem's patented product. In terms of dollars, Amchem and now Henkel have sold over $120 million of patent product since 1973 (Hr.Tr. 58–59; Kdl.Tr. 499–506; Das.Tr. 723; PX–30A; PX–29A).

81. When one considers together Henkel's and Coral's sales of the temperature aqueous acidic cleaners for 3004 aluminum beverage containers, it is clear that the commercial success of these products continues today. A chart illustrating sales in pounds is most illustrative (PX–29B; PX–30B).

82. No evidence was presented at the hearing to suggest that Coral conducted independent research to arrive at its accused formulation. Coral has continued to copy the successful '661 composition even after losing participation as a protester throughout the reissue proceedings with knowledge of the reissued claims. Coral's copying continues despite its admitted knowledge of means to avoid infringement of the '661 claims (Das Tr. 763–64, 766–67, 837; Bdt.Tr. 1158–67; PX–48 ¶ 12).

83. Success by Binns was by no means assured or even predictable. Those skilled in the art, Binns, his supervisor, and Steinbrecher set the odds of a successful invention at only 50%. The cleaning requirements for this industry impose substantial constraints, many of which are at opposite purposes. Binns overcame these odds (PX–21; PX–48, ¶ 4; Stbr.Tr. 196–97, 198–207).

C. *Coral's Infringement And Intervening Rights*

84. Henkel does not assert infringement of the surrendered '115 patent. Henkel asserts infringement of the '661 patent claims occurring on or after May 3, 1988.

85. Coral admitted that assuming the validity of the '661 patent, Coral has actively induced infringement of the claims of the patent after May 3, 1988. Coral argued at one point that the limitation in the claims as to the source of the acids being hydrofluoric and sulfuric acids respectively was a distinction without a difference since all acidic solutions prepared from acids or acid salts will contain the acids in solution. Coral's own witnesses, however, noted that the addition of acid salts will generate additional unwanted and undesirable ions in the cleaning solution whereas the addition of the acids *per se* would not have these adverse effects (Blo.Tr. 1086–88, 1106–07; Das Tr. 734–36). Coral's witnesses also admitted that as to the Clene 100/ACC–2 products, Coral (or Coral's customers) add the acids as acids *per se* to the cleaning solution and directly infringe the '661 patent claims. Coral has continued to sell

more and more of these infringing cleaners, rather than switch production to a non-infringing alternative (PX–44; PX–45; PX–46; DX–124 ¶ 4; Das Tr. 763–66, 768–69, 957). *See also,* PX–47 ¶¶ 7, 8; PX–48 ¶ 12.

86. Coral is not entitled to continue its infringement of the '661 patent under the doctrine of equitable intervening rights. The Court finds there are at least three factors that weigh against permitting Coral to continue its infringement. First, the majority of Coral's capital expenditures were made after September 1980 when the '661 reissue application was filed by Amchem/Henkel. Coral participated in the reissue proceedings and knew at all stages of the proceedings that the '661 patent might issue. The continued investment in the infringing products was at Coral's risk and was not made with the good faith required under 35 U.S.C. § 252 (Bdt.Tr. 1201–02, 1206–08, 1225–26; PX–14; PX–2F, p. 213–218).

Second, in November 1987, Coral admitted that it had manufactured and sold cleaning compositions using ammonium bifluoride in place of hydrofluoric acid (PX–16). Coral presently sells such non-infringing compositions, called ACC–2A, to some of its customers. Coral avers that these non-infringing compositions are somewhat more expensive due to the difference in raw material costs. However, such a price difference does not excuse infringement where Coral has an admitted alternative. At the hearing, Coral's Vice President admitted that the same Coral production facilities and personnel can be used to make these non-infringing compositions. Because Coral has such ability to avoid infringement, any investment in the infringing products copied from Henkel cannot have been in good faith. To permit Coral to continue its blatant infringement would not be equitable (PX–44; PX–45; PX–46; Bdt.Tr. 1202–03, 1225–26; Das Tr. 766–70, 837, 957, 964–65; PX–47 ¶ 9; PX–48 ¶ 12; DX–125 ¶¶ 17, 18).

Third, this is a "narrowed reissue". During the reissue proceedings, additional limitations narrowed the scope of the claims of the '661 patent. Any activity after May 3, 1988, that would infringe the narrow claims of the '661 patent would also have infringed the broad claims of the '115 patent if committed before May 1988. Any investments made by Coral in products accused of infringement after reissue of the '661 patent was imminent, which would be the majority of Coral's investment, are not the types of investments equitable intervening rights are intended to protect (Bdt.Tr. 1206–08).

IRREPARABLE HARM

87. The evidence discussed above demonstrates that (a) Coral will not be able to establish, by clear and convincing evidence, that the '661 patent claims are invalid for obviousness; and (b) Coral infringes the patent claims.

88. Henkel has additionally made a clear showing that it has lost and continues to lose customers to Coral before and during the pendency of this suit. James Kendall, Henkel's Marketing Manager for Aluminum Container Industry Products, testified that even while Henkel's Motion for a Preliminary Injunction has been pending, Henkel has lost several customers, representing 750,000 pounds or about $190,000 in lost sales per year. Loss of an account also affects sales of related Henkel products. The can manufacturing process requires the use of conversion coatings and mobility enhancers, which Henkel supplies. The opportunity for these additional sales is adversely affected by the loss of low temperature acid cleaner sales. Similarly, the loss of a can line affects Henkel's good will. As Jack Harsma, a witness for Henkel, testified, once a customer is lost, the vendor must start from scratch, requalify in the plant, and rebuild its good will. The damage to Henkel's market share and commercial reputation are not measurable in strictly monetary terms (Kdl.Tr. 497–98, 506; Hr.Tr. 59–60; PX–29A; PX–30A; PX–58, ¶¶ 6, 7; PX–59, ¶ 2).

88A. Henkel has identified several companies, such as Pennwalt, Quaker, Oakite, Mangill and W.R. Grace, that have the capabilities to enter the low temperature aluminum can cleaning market. These

chemical companies currently sell other products to the aluminum can manufacturing plants. The addition of a low temperature acid can cleaner to their product lines would not be difficult. Failure to obtain an injunction against Coral will encourage these other potential infringers. (PX–59, ¶ 2; DX–127, p. 26).

88B. Coral has admitted that "[w]hen a company in this business loses a customer to a competitor, it has to start at ground zero to try to regain that customer. The goodwill generated during the time period in which it had the account is lost." Coral Proposed Finding of Fact 151.

■ 88C. The Court finds that Henkel did not unreasonably delay in filing for preliminary injunctive relief. In light of Coral's prior assertions that it had been selling a noninfringing product, Henkel prudently undertook to confirm infringement by obtaining and testing competitive samples, a time consuming process. In addition, it was not unreasonable for Henkel to await the outcome of the appeal from this Court's earlier decision on the '198 patent before filing suit on the '661 claims. That Federal Circuit decision was not issued until late in 1988. (PX–59, ¶ 3, 4).

## BALANCE OF HARDSHIPS

■ 89. The equities strongly favor Henkel. Despite contrary testimony of Bendert, there is no credible evidence demonstrating that Coral is financially dependent on its low temperature acid cleaner. It will not be forced out of business by the injunction entered here. Coral's Dr. Das agreed that "80 percent of Coral's business, at least, would be unaffected by any injunction that might issue" (Das Tr. 718). Coral represented to the PTO that it had an acceptable non-infringing alternate—ammonium bifluoride, which it can use to formulate its product (PX–16). Coral can switch to this same non-infringing alternative that it is currently marketing and has marketed in the past. Although Coral may be forced to raise its prices or receive a reduced profit after the switch, that is not a proper basis to deny an injunction (Das

Tr. 718, 766–70; Bdt.Tr. 1219–24, 1225–26, 1232–33; PX–47 ¶ 9; DX–125 ¶¶ 15, 17, 18).

## PUBLIC INTEREST

■ 90. The Court finds that the public will not be harmed by the issuance of a preliminary injunction. Henkel can supply the total market with its needs (Kdl.Tr. 505–06). Indeed, an injunction will serve the public interest by protecting and, therefore, encouraging research and development efforts leading to patent protection.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this lawsuit, and venue is proper. 28 U.S.C. §§ 1338, 1400(b), 2201 and 2202.

2. The United States patent system has its foundation in the Constitution, which gives Congress the power "To promote the Progress of Science and Useful Arts, by securing for limited times to Authors and Inventors the exclusive right to their respective Writings and Discoveries." U.S. Const., Art. I, § 8. A duly issued patent gives the patent owner the right to exclude others from making, using or selling the patented invention for a limited time (17 years). 35 U.S.C. § 154. This is the *quid pro quo* in exchange for the public disclosure of the invention and the further advancement of "science and the useful arts."

2A. Patents are not "monopolies."

Nowhere in any statute is a patent described as a monopoly. The patent right is but the right to exclude others, the very definition of "property". * * * The antitrust laws, enacted long after the original patent laws, deal with appropriation of what should belong to others. A valid patent gives the public what it did not earlier have.

*Schenck v. Nortron Corp.*, 713 F.2d 782, 786 n. 3 (Fed.Cir.1983) (Markey, C.J.). Coral improperly characterized patent rights as "monopolies." "Disclosure of an invention found to have revolutionized an industry is but a classic example of the ideal working of the patent system. If a patentee enjoys widespread sales, that too is but an example of the incentive-useful arts

promoting element in the patent system."
*Schenck,* 713 F.2d at 784.

3. To obtain an injunction at this stage of the proceedings, a plaintiff-patentee must establish four factors:

(1) the plaintiff has at least a reasonable likelihood of success on the merits;

(2) the plaintiff does not have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and

(4) the granting of a preliminary injunction will not disserve the public interest.

*Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed.Cir.1988); *Pittway v. Black & Decker,* 667 F.Supp. 585, 587–88 (N.D.Ill.1987). These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested. *Hybritech Inc.,* 849 F.2d at 1451.

4. The moving party's burden is no different in a patent case than for other areas of the law. Only a "clear showing" is generally required. When a patentee "clearly shows" that its patent is not invalid and has been infringed, a court may, after a balance of all of the competing equities, preliminarily enjoin another from violating the rights secured by the patent. *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985); *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987). As this Court has previously recognized, protection of the rights granted by a patent usually requires immediate injunctive relief. *Pittway,* 667 F.Supp. at 593.

## REASONABLE LIKELIHOOD OF SUCCESS

5. A patent holder must establish a likelihood of success on the merits both with respect to the validity of its patent and with respect to infringement. *Hybri-*

*tech Inc. v. Abbott Laboratories,* 849 F.2d at 1451 (Fed.Cir.1988); *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1578 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

### A. *Validity*

6. The '661 patent is presumed to be valid by statute. 35 U.S.C. § 282 provides in pertinent part:

A patent shall be presumed valid. Each claim ... shall be presumed valid independently ... of other claims.... The burden of establishing invalidity of ... any claim ... shall rest on the party asserting such invalidity.

The presumption of validity can only be overcome by clear and convincing evidence. *Alco Standard Corp. v. Tennessee Valley Authority,* 808 F.2d 1490, 1498 (Fed.Cir. 1986), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

7. The presumption of validity also applies to a reissue patent which the PTO has re-examined and issued, after reconsideration of the prior art on which the original patent was held invalid. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.,* 607 F.2d 885, 895 (10th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985).

8. The presumption of patent validity carries with it the assumption that the evidence considered by the PTO when granting the patent was material. In considering a summary judgment motion the record must show conclusively that the new evidence was immaterial. *Applied Materials, Inc. v. Gemini Res. Corp.,* 835 F.2d 279, 281 (Fed.Cir.1987).

9. Reissue proceedings are remedial in nature. During reissue, the PTO undertakes a complete validity inquiry, and it may reject reissue claims on any basis and over any prior art, even that cited during the original prosecution (37 C.F.R. § 1.176). The PTO Examiner must reject claims for obviousness under 35 U.S.C. § 103 if obviousness is established by a

mere preponderance of the evidence. By contrast, once the reissue has issued, an infringer such as Coral must establish invalidity by clear and convincing evidence. *See Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1427 (Fed.Cir.1988). One of the express purposes of reissue is to permit a patentee to correct error without deceptive intent by adding limitations that narrow the scope of the original claims, thereby better distinguishing over the prior art and avoiding obviousness. *White v. Fafnir Bearing Co.,* 389 F.2d 750, 754–55 (2d Cir.1968); *see also, In re Weiler,* 790 F.2d 1576, 1579 (Fed.Cir.1986).

10. The PTO's examination procedure and the resulting reissue of the '661 patent should be given appropriate weight by this Court. The Examiner's decision on the reissue application is evidence that must be considered in determining whether Coral can meet its statutory burden of showing invalidity by clear and convincing evidence. Upon reissue of the '661 patent, Coral's burden of proving invalidity is made heavier. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir. 1985); *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555 (Fed.Cir.1985); *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1364 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

10A. An alleged prior use must be established by clear and convincing evidence. Oral testimony as to such purported prior use must normally be corroborated by other evidence. *Sjolund v. Musland,* 847 F.2d 1573, 1578 (Fed.Cir.1988) ("Oral testimony to establish the existence of allegedly anticipatory devices has long been viewed with skepticism."); *T.W. Kutter Inc. v. Koch Supplies, Inc.,* 634 F.Supp. 705, 720 (W.D.Mo.1986) ("Oral testimony of alleged prior use, unsupported by contemporaneous documents, must be subject to appropriate scrutiny under the clear and convincing standard of proof.").

11. All of the prior art asserted by Coral was considered by the PTO. As a party to a protested reissue, Coral's arguments as to the application of the art

cited were also considered by the PTO. When the prior art before the court is the same as that before the PTO, the burden on the party asserting invalidity is more difficult to meet. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1359 (Fed.Cir.1983). The burden was on the infringer, Coral, to show that the PTO Examiner had not considered pertinent prior art. *Richdel, Inc. v. Sunspool Corp.,* 714 F.2d 1573, 1579 (Fed.Cir.1983). Coral failed to meet this burden.

12. Because Coral relies on prior art that was considered by the Examiner, "it has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." *Polaroid Corp. v. Eastman Kodak Co.,* 789 F.2d 1556, 1560 (Fed.Cir.), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986). The PTO "includes one or more examiners who are presumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art, and whose duty it is to issue only valid patents." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied,* 484 U.S. 823, 98 L.Ed.2d 47 (1987); *State Industries, Inc. v. Mor–Flo Industries, Inc.,* 639 F.Supp. 937, 945 (E.D.Tenn. 1986), *aff'd mem.,* 818 F.2d 875 (Fed.Cir.), *cert. denied,* 484 U.S. 845, 108 S.Ct. 140, 98 L.Ed.2d 97 (1987) (Patent Examiner is presumed to be "an expert in [the] field"). The Court finds that Coral has not overcome the deference due to the government experts.

13. The burden of establishing invalidity in a preliminary injunction motion remains on the challenger. *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1270 (Fed.Cir.1985); *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987). Coral must prove that

the '661 patent is invalid. Henkel must show there is a reasonable likelihood that Coral's attack on the '661 patent's validity will fail. Such entitlement is determined in the context of the presumptions and burdens that would inhere at trial on the merits. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387–88 (Fed.Cir. 1987). Henkel has proven a reasonable likelihood that Coral will not be able to establish invalidity by clear and convincing evidence.

14. The Court finds that the limitations added to claim 7 of the '661 patent, and hence to claims 8 through 15 which are dependent thereon, substantially narrowed the scope of the claims as compared with the claims of the '115 patent. The '661 claims distinguish over the prior art cited during the reissue proceedings and the prior art cited by Coral in this action.

## B. *Collateral Estoppel*

15. Collateral estoppel is correctly applied to prevent a patentee from suing on the claims of a single patent in piecemeal fashion where those claims are substantially identical. *Westwood Chemical, Inc. v. United States*, 525 F.2d 1367, 207 Ct.Cl. 791 (1975). Where claims from a separate patent claiming an independent and distinct invention are asserted in the second action, the *Westwood* decision must be distinguished. *Cf. Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 607 F.2d 885, 895 (10th Cir. 1979); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132 (Fed.Cir.1985).

16. Once the PTO has recognized the independence of two inventions claimed in a patent application, such as compositions and processes, it issues a restriction requirement. The restriction requirement reflects the PTO's determination that "two or more independent and distinct inventions are claimed in a single application." 37 C.F.R. § 1.142. Although compositions and processes for using such compositions are related, these two distinct inventions are capable of separate manufacture, use or sale and are patentable over each other. *See* MPEP § 802.01 (1989). The '661 com-positions and '198 process are not the same invention. *Studiengesellschaft Kohl mbH v. Northern Petrochemical Co.*, 784 F.2d 351, 354 (Fed.Cir.), *cert. dismissed*, 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986) (process and composition claims are separate and distinct inventions).

17. Judge Marshall considered the validity of claims for a process of using compositions to clean 3004 aluminum alloy. Here, claims to compositions are presented. Contrary to what has been argued by Coral, the fact that a process of using compositions has been held to be obvious does not lead to the conclusion that the separately claimed compositions used are obvious. *In re Durden*, 763 F.2d 1406, 1410–11 (Fed. Cir.1985).

18. The public interest in upholding valid patents outweighs the public interest underlying collateral estoppel where the patentability issues in each action are not substantially identical. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 607 F.2d 885, 894 (10th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980).

19. A presumption of validity attaches to reissued patents. This presumption of validity must be considered when determining whether there are substantial differences between the '661 and '198 patent claims. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 607 F.2d 885, 895 (10th Cir.1979); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132 (Fed.Cir.1985).

20. According collateral estoppel effect to nonidentical adjudicated claims would amount to treating the claims previously held to be invalid as prior art and is improper, resulting in a domino approach in which each successively narrower claim is compared with the one before it, not with the prior art as a whole. Such analysis is inappropriate since it improperly gives prior art effect to the subject matter of an invalid claim. A claim may be invalid for obviousness under 35 U.S.C. § 103 but still describe a combination not found in the prior art. Moreover, it is well settled that

each claim of a patent is entitled to a presumption of validity and is to be treated as a complete and independent invention. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1137 (Fed.Cir.1985).

 21. The process claims held to be obvious by Judge Marshall broadly described acidic aqueous aluminum cleaning compositions. Significant restrictions newly found in the previously unadjudicated composition claims ('661) and not present in the process claims ('198) or in the original patent ('115) require a new analysis of these claims as prescribed by *Graham v. John Deere. Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.,* 607 F.2d 885, 895–96 (10th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980). New findings must be made as to the scope and content of the prior art, the level of ordinary skill in the art, the differences between the prior art and the compositions claimed in the '661 patent and evidence on secondary considerations of non-obviousness. These findings are not made only with respect to the newly added limitations in the '661 claims that were not present in the '198 claims, but with respect to the '661 claimed invention taken as a whole. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1141 (Fed.Cir. 1985).

21A. Henkel has not relitigated findings of fact made by Judge Marshall. All of Judge Marshall's findings were necessarily made in the context of the '198 process claims. Before the Court now is the '661 composition patent, a separate invention, containing substantial limitations and raising issues not considered by Judge Marshall.

21B. Coral has conceded that as a matter of law the '661 claims are sufficiently different from the '198 patent claims that the invention as now claimed must be evaluated in terms of 35 U.S.C. § 103. Coral also has not argued that Judge Marshall's findings on the differences between the '198 patent claims and the prior art should have collateral estoppel effect. Coral does, however, argue that other factual findings bind this Court when considering the '661 patent claims.

[32] 21C. Issue preclusion applies to earlier findings only where "the issue is identical to one decided in the first action." *A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 702 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). The obviousness inquiry does not lend itself to rigid carryover of findings because the invention as claimed, not the invention disclosed in the specification, must be evaluated under the *Graham v. John Deere* factors. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.,* 607 F.2d 885, 894 (10th Cir. 1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980). With the newly added limitations the '661 claims require new and additional findings because the "issues" change with the scope of the claims.

21D. The policy considerations underlying collateral estoppel are not harmed by the inapplicability of the doctrine in this case. The Court has conducted a nine-day hearing which has focused on the issue of obviousness in light of the added limitations. Consideration of obviousness or nonobviousness in light of a fully developed record will not lead to a waste of judicial resources or the risk of inconsistent judgments.

 22. The Court finds that the claims of the '661 patent are not substantially identical to the claims of the '198 patent and raise different issues of validity. The Court also finds that the narrowed claims of the '661 patent distinguish over the same prior art which invalidated the claims of the '198 patent. Application of collateral estoppel is inappropriate here. The prior decision on the '198 patent claims did not consider the composition invention with all the narrowing limitations added to the '661 claims during reissue. These new limitations include the restriction that the sources of acids be hydrofluoric and sulfuric acid, the exclusion from the composition of corrosion inhibitors in a corrosion-inhibiting amount, the exclusion of sludge-forming materials, and the requirement that the

compositions clean to a water-break free condition. The 1987 decision of this Court that was directed to the different and more broadly claimed invention of the '198 patent claims (process) does not apply to the '661 patent claims (composition).

### C. Obviousness

23. In determining validity, claims of a patent must be construed to uphold their validity if possible. *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 749 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988); *ACS Hospital System, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577 (Fed.Cir. 1984); *Carman Indust., Inc. v. Wahl*, 724 F.2d 932, 937 n. 5 (Fed.Cir.1983). Limitations from the patent specification cannot be read into the claims. *E.I. DuPont de-Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1432–34 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed.Cir.1988).

24. Coral alleges that the claims to compositions in the '661 patent are invalid for obviousness under 35 U.S.C. § 103. This section provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

25. The ultimate conclusion of obviousness is one of law, but the conclusion lends itself to certain basic factual inquiries. The mandate of § 103 is that "the invention as a whole must be considered.... [This] embraces the structure, its properties, and the problem it solves." *In re Wright*, 848 F.2d 1216, 1219 (Fed.Cir. 1988); *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 678–79 (Fed.Cir.1988). Under § 103, the relevant inquiries are: (a) the scope and content of the prior art; (b) the differences between the prior art and the claims at issue; (c) the level of ordinary skill in the pertinent art at the time the invention was made; and (d) the objective evidence of non-obviousness, such as commercial success, satisfaction of a long-felt need, failure of others, recognition by the industry, and copying. Against this background, the obviousness or non-obviousness of the subject matter is determined. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 989 (Fed.Cir.1988).

25A. "[A]n expert's opinion on the legal conclusion of obviousness is neither necessary nor controlling." *Avia Group International, Inc. v. L.A. Gear of California, Inc.*, 853 F.2d 1557, 1564 (Fed.Cir. 1988). Where a technical expert admits that he or she is not an expert in patent law and his or her testimony is not offered as that of a legal expert, that witness' opinion on the validity of the patent, a legal question, need not be admitted. *Union Carbide Corp. v. Tarancon Corp.*, 682 F.Supp. 535, 538, 6 U.S.P.Q.2d 1847, 1849 (N.D.Ga.1988).

26. In determining whether Coral has established that the '661 patent is invalid for obviousness, the Federal Circuit instructs:

> The obviousness standard, while easy to expound, is sometimes difficult to apply. It requires the decision maker to return to the time the invention was made. The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time.... That which may be made clear and thus 'obvious' to a court, with the invention fully diagrammed and aided ... by experts in the field, may have been a breakthrough of substantial dimension when first unveiled.

> In this case we are convinced that the district court misapplied the obviousness standard. It has impermissibly used hindsight to reconstruct the claimed invention from prior art with the invention before it and aided by [infringer's] expert, rather than viewing the invention from the position of a person of ordinary

skill at the time it was made. The court also erroneously analyzed and weighed secondary considerations of non-obviousness.

*Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1050–51 (Fed.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988) (citations omitted).

27. The apparent simplicity of a claimed inventioned does not render it more easily invalidated. Courts have noted that to equate simplicity with obviousness is an erroneous concept. *State Indust., Inc. v. Mor–Flo Indust., Inc.,* 639 F.Supp. 937, 945–46 (E.D.Tenn.1986), *aff'd mem.,* 818 F.2d 875 (Fed.Cir.), *cert. denied,* 484 U.S. 845, 108 S.Ct. 140, 98 L.Ed.2d 97 (1987). The patent system is designed not only for sophisticated and radical technical achievements, but also for products or methods that may appear to be simple. The Federal Circuit's comments in *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1572 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987), and more recently quoted in *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1391 (Fed.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988), are fully applicable here. The court stated:

> The drawings may be deceptive in seeming to show merely a simple, small, plastic tie.
>
> \* \* \* \* \* \*
>
> though technology has burgeoned, the patent system is not limited to sophisticated technologies.... Nowhere in the statute or the Constitution is the patent system opened only to those who make complex inventions difficult for judges to understand.... The constitutional purpose is to encourage disclosure of patentable contributions, to 'progress in the useful arts, all the useful arts,' not just the esoteric. The statute requires utility, novelty, and non-obviousness, not complexity.

810 F.2d at 1572.

28. It is also critical to recognize that "obviousness" is not determined by the ability of an infringer to reconstruct an invention from prior art, long after it had copied the patent and not the prior art. As the Federal Circuit stated in *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1544 (Fed.Cir.1984), the relevant inquiries are directed to the "real world" surrounding the patent:

> [The infringer's arguments] ignore all facts in the record that objectively establish the circumstances and human events surrounding the birth of the invention and its effect on the industry, as well as many of the fact findings militating against its positions on the issues.
>
> [P]atent cases should not be mere games played with pieces of paper called references and the patent in suit. Lawsuits arise out of the affairs of people, real people facing real problems. So here, the technical problem out of which grew the present litigation was real. It was solved by inventor....

The "real" factors enumerated by the Federal Circuit—the deficiencies of the prior art, the long-felt need for a successful product, the commercial success of the patented invention, and Coral's copying of Henkel's product—are all present in this case. These factors strongly disprove Coral's allegations of obviousness.

29. In determining whether Coral has proven that the combined prior art rendered the patent obvious, the mere fact that individual elements of the inventions are old and can be found in the prior art is irrelevant. The Federal Circuit recently reiterated this rule in *Grain Processing Corp. v. American Maize Products Co.,* 840 F.2d 902, 907 (Fed.Cir.1988):

> Maize's effort to establish obviousness by showing that each element of the patented products may be found somewhere in the prior art is also unavailing. In determining obviousness, the inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention as a whole for which patentability is claimed.

*See also Hartness Int'l, Inc. v. Simplimatic Eng. Co.,* 819 F.2d 1100, 1108 (Fed.Cir. 1987).

29A. A finding that "an invention is an 'improvement' is not a prerequisite to patentability" since it "is possible for an invention to be less effective than existing devices but nevertheless meet the statutory criteria for patentability." *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.*, 807 F.2d 955, 960 n. 12 (Fed.Cir.1986). The '661 claimed compositions achieved the desired cleaning result without the disadvantages of the prior hot cleaners.

■■■ 30. A critical issue of the § 103 determination is whether Coral will be able to prove by clear and convincing evidence that there was a suggestion in the references themselves that the teachings of the various prior art references should be combined in the exact way as the patented invention. The court held in *Grain Processing Corp. v. American Maize Products Co.*, 840 F.2d 902, 907 (Fed.Cir.1988):

When resolving an obviousness issue, the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.

In *In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir. 1988), it stated:

[T]eachings of references can be combined *only* if there is some suggestion or incentive to do so. Here, the prior art contains none.

(Emphasis in original) (citations omitted). In *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir. 1984), the Federal Circuit further held:

As this court has held, a combination may be patentable whether it be composed of elements all new, partly new, or all old.

Fatal to Beckman's cause is its inability at trial and here to cite anything in the prior art items, individually or together, that, can be seen as suggesting [patentee's invention]. Indeed, the facts of real world experience establish the contrary.

In *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1051 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988), the court held:

When prior art references require selective combination by the court to render obvious a subsequent invention, there must be some reason for the combination other than the hindsight gleaned from the invention itself. Something in the prior art as a whole must suggest the desirability, and thus the obviousness, of making the combination.

(Citation omitted). *See also Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568, 1574 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987) (it is error to "focus on isolated minutiae in a prior art patent while disregarding its scope, i.e., its entire disclosure, and how its disclosed structure works").

31. Coral's attempts to establish obviousness are based not only on multiple references, but also on presuppositions that the person of ordinary skill would necessarily pick and choose among the multitude of disclosures to combine them exactly as did the inventor. This is insufficient to meet Coral's burden of proof. In *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1571 (Fed.Cir.), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986), the court held:

Thus Kodak would have us pick and choose individual elements from three prior art patents and thereby re-create the invention.... Kodak does not tell us, however, what there is in the three prior patents that would have suggested such picking and choosing at the time the invention was made.

32. For purposes of § 103, a "person of ordinary skill in the art is presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 455 (Fed.Cir.1985). The Court finds that the hypothetical "person of ordinary skill in the art" would have been a person with a bachelor's degree in chemistry having several years of practical experience in the field of metal treatment.

■■■ 33. Another major deficiency of Coral's invalidity arguments is that Coral necessarily relies on the '661 patent as a

"road map" to construe and combine the alleged prior art in a way which would lead to obviousness. The trier of fact must resist the temptation to use this type of hindsight. Under § 103, the invention must be shown to have been obvious by the suggestions of the prior art itself, and without resort to the "road map" approach of utilizing the patent in suit. The Federal Circuit stated:

> To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.... One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention.

*In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir. 1988) (*quoting W.L. Gore Associates Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir.1983)). *Accord Grain Processing Corp. v. American Maize Prod. Co.*, 840 F.2d 902, 907 (Fed.Cir.1988) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit"); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568, 1574–75 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1012 (Fed.Cir.1983).

34. In determining the scope and content of the prior art, and determining whether the prior art suggested the claimed invention, the references "must be read as a whole and consideration must be given where the references diverge and teach away from the claimed invention." *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1481 (Fed.Cir. 1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987) (a prior art reference "must be considered in its entirety, i.e., as a whole, including portions that would lead away from the invention in suit"). The teachings of the references are to be applied in the context of their significance to a technician at the time a technician without our knowledge of the solution. *Interconnect Planning Corp. v. Feily*, 774 F.2d 1132, 1143 (Fed. Cir.1985). In this case, the references argued by Coral are in many ways antithetical in concept to the '661 invention and to each other, and, thus, do not form a basis for finding the '661 patent obvious.

34A. The Federal Circuit has overruled *Kwik Set, Inc. v. Welch Grape Juice Co.*, 86 F.2d 945 (2d Cir.1936). Some nebulous standard of "invention" is not the law.

> It is the prior public knowledge—the 'prior art'—by which patentability is tested. A patentee may set the metes and bounds of that which is sought to be patented, and it is not material whether the phenomena just outside these claim limits are qualitatively different from that which is claimed. The patentee is not required to show that some technological discontinuity exists between the claimed invention and the subject matter just outside the claims, but only that the claimed subject matter would have been nonobvious in view of the prior art.

*Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 823 (Fed.Cir.), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988).

35. Coral's argument that a person of ordinary skill in the art "could have created" the '661 invention had they known of the problems in the use of high temperature acid cleaners is unpersuasive. Henkel has proven here and through the reissue proceedings which resulted in the reissue patent that no one in the art, except Binns, recognized the problem, and then solved it by the invention of the '661 patent. "The inventor is not required to have been the winner of a race to a common goal." *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 740 (Fed.Cir.1984). "Obvious to try" is not the standard under § 103. *In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir.1988);

*Hodosh v. Block Drug Co.*, 786 F.2d 1136, 1143 n. 5 (Fed.Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986) (" 'ought to be tried' is not the standard with which obviousness is determined").

■ 35A. The opinions of the inventor, Mr. Binns, who is now an employee of infringer Coral, as to the validity of the '661 patent claims should not be accorded any weight. Under the doctrine of assignor estoppel, Mr. Binns is estopped from challenging the validity of the '661 patent. *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 1225–26 (Fed.Cir.), *cert. dismissed,* 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988); *American Fence Co. v. MRM Security Systems, Inc.,* 710 F.Supp. 37, 40–41 (D.Conn.1989).

36. In resolving the question as to whether Coral has proven obviousness of the '661 invention, this Court must consider the objective indicia of non-obviousness ("secondary considerations") set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). The objective factors, which Henkel has established here, include the long-felt need of the industry for a successful low temperature acid cleaner, attempts and failures by others to design such a commercial product, the immediate recognition and commercial success of the patented invention, respect for the patents by the industry, and the copying by Coral. The Federal Circuit has suggested that these objective factors, which focus attention on issues that are more susceptible of judicial treatment than are the highly technical facts, are the most critical evidence of non-obviousness. *Demaco Corp. v. Langsdorff Lic. Ltd.,* 851 F.2d 1387, 1391–92 (Fed.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988). The court has stated that this type of objective evidence "can often serve as insurance against the insidious attraction of the siren hindsight when confronted with a difficult task of evaluating the prior art." *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). *See also Alco Standard Corp. v. Tennes-*

*see Valley Authority,* 808 F.2d 1490, 1498 (Fed.Cir.1986), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987); *Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1575 (Fed.Cir. 1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Jones v. Hardy,* 727 F.2d 1524, 1530 (Fed.Cir.1984).

37. Secondary considerations become of utmost importance when considering technical information.

"Courts, made up of laymen as they must be, are likely to either underrate, or to overrate the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention."

*Safety Car Heating and Lighting Co. v. General Electric Co.,* 155 F.2d 937, 939 (2d Cir.1946) (L. Hand).

■ 38. The evidence of commercial success and the other objective indicia are highly relevant to lack of obviousness, because Henkel's competitors, including all those previously trying to develop a viable low temperature acid cleaner, were economically motivated to make the '661 invention sooner if it had been truly obvious. The standard rationale for giving substantial weight to these "secondary factors"— that they provide objective evidence of how the patented device was viewed by those most knowledgeable and interested in the product—applies here and leads to the conclusion that the invention is not obvious. In this case, as in many cases decided by the Federal Circuit, even if Coral has provided some credible evidence of obviousness, these objective considerations "may often be the most pertinent, probative and cogent evidence in the record ... establish[ing] that an invention appearing to have been obvious ... was not." *Demaco Corp. v. Langsdorff Lic. Ltd.,* 851 F.2d 1387, 1391, 7 U.S.P.Q.2d 1222, 1225 (Fed. Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988). *See also Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837

F.2d 1044, 1053 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988).

38A. Evidence that the success of the claimed invention may have been due in part to increased energy costs does not preclude finding of commercial success. *Mendenhall v. Astec Industries, Inc.*, 13 U.S.P.Q.2d 1913, 1941, 1988 WL 188449 (E.D.Tenn.1988), *aff'd mem.* 887 F.2d 1094, 13 U.S.P.Q.2d 1956 (Fed.Cir.1989).

39. The superiority or advantages of the '661 invention must also be considered in determining obviousness, and they need not be contained in the claims. *Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903, 907 (Fed. Cir.1984) ("As for putting advantages ... in claims, they do not properly belong in claims.... It is entirely proper, nevertheless, in evaluating non-obviousness, for a court to take into account advantages directly flowing from the invention patented"); *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 774 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1987) (advantages of invention are to be considered, whether or not claimed, if they are "attributes of ... the claimed invention, which resides in a combination of steps or elements").

40. The fact that Coral chose to infringe the patents in suit, and not practice the prior art, is itself evidence of non-obviousness. *See Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 679 (Fed.Cir.1988) ("Copying is an indicium of non-obviousness, and is to be given proper weight"); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991 (Fed.Cir.1988) ("copying the claimed invention, rather than one in the public domain, is indicative of unobviousness"); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1572 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). Each of the prior art patents on which Coral relies has expired, and Coral is free to use those inventions, but, significantly, it does not.

41. Coral will not be able to meet its burden of proving by clear and convincing evidence that any of the claims are invalid for obviousness. The evidence introduced at the hearing demonstrates that the inventions claimed by the '661 patent were not obvious within the meaning of 35 U.S.C. § 103.

**D. Infringement**

42. Infringement is statutorily defined by 35 U.S.C. § 271:

> [W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefore, infringes the patent.

Henkel has the burden of proving infringement by a preponderance of the evidence. *SRI Intern. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1123 (Fed.Cir.1985); *SSIH Equipment S.A. v. U.S. I.T.C.*, 718 F.2d 365 (Fed.Cir.1983); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir. 1984); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983). Proof that a fact is more likely than not satisfies the preponderance-of-the evidence standard. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983).

43. Inducement to infringe is proscribed by 35 U.S.C. § 271(b), which provides that "(b) Whoever actively induces infringement of a patent shall be liable as an infringer." A person infringes pursuant to 271(b) when he actively and knowingly aids and abets another's direct infringement of the patent. *Water Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 668–69 (Fed.Cir.1988). Inducement to infringe may be shown by circumstantial evidence. *Water Technologies Corp., id.; Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987).

44. Coral admits to infringement except for the language "the source of said acids are respectively sulfuric acid and hydrofluoric acid." Coral further admits that it adds hydrofluoric acid and sulfuric acid directly to the cleaning both in acid form. As the '661 specification and prosecution history make clear, this claim language re-

garding source means that the sulfuric acid and hydrofluoric acid content of the claimed aqueous cleaning composition comes from the addition of the acids themselves and not from the addition of salts or other compounds. Henkel has demonstrated that Coral's activities with its Clene 100 and ACC–2 products constitute active inducement of infringement.

### E. *Intervening Rights*

45. Pursuant to 35 U.S.C. § 252, there are two doctrines, which are loosely called intervening rights. These two doctrines, however, are distinctly different in bases and result.

46. The first doctrine, sometimes called *statutory* or *absolute* intervening rights, is embodied in the first sentence of the second paragraph of § 252. It provides that a reissue patent is effective only as of its reissue date unless the reissue patent contains an infringed claim that is identical to a claim in the original patent. Henkel concedes that there is no identical claim carried over from the '115 patent into the '661 reissue patent and that no damages can be recovered for Coral's activities prior to the date of reissue, May 3, 1988. 35 U.S.C. § 252.

47. The second doctrine, which is called *equitable* intervening rights, is embodied in the second sentence of the second paragraph of § 252. It is an equitable doctrine based on the balance between: (a) the public interest in the patent system and the remedial purpose of the reissue statute; and (b) the private interest of an infringer who innocently and in good faith has undertaken substantial activities that because of reissue turn out to be infringement. Equitable intervening rights protect parties who in good faith innocently develop and manufacture an invention not claimed by an original patent. *Seattle Box Co. v. Industrial Crating and Packing*, 756 F.2d 1574, 1579 (Fed.Cir.1985). "[Section] 252 protects third persons who *rely* on the scope of a claim as originally granted, as against subsequent changes in scope by reissue." *Slimfold Mfg. Co., Inc. v. Kinkead Industries, Inc.*, 810 F.2d 1113, 1117

(Fed.Cir.1987) (emphasis supplied). The doctrine arose in circumstances where the original patent claims were narrow and the reissue claims were broadened to embrace the infringer's activity for the first time. Of course, in a narrowing reissue as here, the infringer's activities are within the scope of both the original and the narrowed reissue claims.

48. Coral has proffered no evidence to show that it began to manufacture its Clene 100/ACC–2 product in good-faith reliance upon the scope of the original '115 patent. There is no evidence that patent counsel was consulted, or that an opinion was received and relied upon. Coral asserts that it has been manufacturing and selling Clene 100/ACC–2 since 1979, but it concedes that it made the majority of its investments after September 1980 when Coral had notice of the reissue proceedings. Coral has failed to establish any of the prerequisites of *equitable* intervening rights and thus Coral has failed to demonstrate even *prima facie* that it has the right to continue to infringe the '661 patent.

49. Where, as here, the reissued claims are significantly *narrowed* during reissue and the infringer, who was accused of infringing the original patent claims, simply disregards the reissue and continues to infringe, equity does not favor permitting the infringing conduct to continue. In the few decisions considering the application equitable intervening rights to "narrowed reissues," none have actually permitted the relief sought by Coral here, the unabated continued infringement of the reissue patent in question. *See, e.g., Wayne–Gossard Corp. v. Sondra, Inc.*, 434 F.Supp. 1340 (E.D.Pa.1977), *aff'd per curiam*, 579 F.2d 41 (3d Cir.1978); *Wayne–Gossard Corp. v. Moretz Hosiery Mills, Inc.*, 539 F.2d 986 (4th Cir.1976); *White v. Fafnir Bearing Co.*, 263 F.Supp. 788 (D.Conn.1966), *aff'd*, 389 F.2d 750 (2d Cir.1968).

49A. Courts have held: "The defense of intervening rights is unavailable when claims of a reissue patent are narrowed, rather than broadened." *Mendenhall v. Astec Industries, Inc.*, 13 U.S.P.Q.2d 1913,

1948, 1988 WL 188449 (E.D.Tenn.1988), *aff'd mem.* 887 F.2d 1094, 13 U.S.P.Q.2d 1956 (Fed.Cir.1989).

50. Equitable intervening rights are inapplicable in this case for another reason. Coral knew that Henkel was seeking the '661 reissue, and it fully participated in those proceedings from the beginning. Nevertheless, Coral continued at its peril to make and sell the accused compositions and to invest in facilities and equipment to further the infringing activity. It may not now complain that it took the risk and lost. *See White v. Fafnir Bearing Co.*, 263 F.Supp. at 811 (investments made while defendant was "fully cognizant at all times of the questionable legal status of [its] conduct" were not made in good faith). Moreover, even before the '661 patent reissued, Coral knew there were non-infringing alternatives to the claimed cleaning compositions of the '661 patent. Despite this knowledge, Coral failed to avoid infringement of the '661 patent once it issued, which infringement continues. As stated in *Colt Industries Operating Cor. v. Index Werke KG*, 205 U.S.P.Q. 990, 1005 (D.D.C. 1979):

> Colt's knowledge of the original patent, the reissue application and the proceedings before the Patent Office on the reissue application and the issuance of the reissue, patent and plaintiff's [Colt's] failure to attempt to avoid infringement when the reissue application was filed or when the reissue patent issued, preclude Colt from acquiring any intervening rights.

51. To grant *equitable* intervening rights to Coral, excusing Coral's *future* infringement of the claims of the '661 patent would thwart the underlying purpose of § 252 and "would effectively extinguish the rights of the patentee under the guise of protecting the infringer." *Wayne–Gossard Corp. v. Sondra, Inc.*, 434 F.Supp. at 1363.

## IRREPARABLE HARM

52. The second factor required to be established by Henkel is that it will suffer irreparable harm if the injunction is not granted. *Hybritech Inc. v. Abbott Labora-tories,* 849 F.2d 1446, 1456 (Fed.Cir.1988); *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987).

53. In matters involving patent rights, irreparable harm will be presumed where, as here, a clear showing has been made that the patent is not invalid and that it has been infringed. To hold otherwise would be contrary to the public policy underlying the patent laws. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987). Henkel has made a clear showing that it will prevail on the validity and infringement issues.

54. The very nature of the patent right is the right to exclude others. The owner of a not-invalid and infringed patent is entitled to the full enjoyment and protection of his patent rights. An infringer should not be allowed to continue his infringement in the face of such a holding. A court should not be reluctant to use its equity powers once a party has clearly established his patent rights. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). This presumption of irreparable harm derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremedial harm. The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987).

55. The nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987); *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1457 (Fed.Cir.1988). While monetary relief is often the sole remedy for past infringement, it does not follow that a

money award is also the sole remedy against future infringement. The patent statute further provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money. As stated in *American Home Products Corp. v. Abbott Laboratories*, 522 F.Supp. 1035, 1038 (S.D.N.Y.1981), loss of market share constitutes irreparable injury "because market share is so difficult to recover." If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed.Cir.1985); *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed.Cir.1988); *see also Pretty Punch Shoppettes, Inc. v. Hauk*, 844 F.2d 782, 784 (Fed.Cir.1988) (trial court improperly focused on defendant's statement that she would be able to meet any damages due plaintiff).

55A. Patent rights do not get weaker as they near the end of their 17 year term. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1234 (Fed.Cir. 1985) ("Patent rights do not peter out as the end of the patent term, usually 17 years, is approached.") The '661 patent with four remaining years of life is as entitled to injunctive relief as a newly issued patent.

55B. A patentee is not required to litigate against all his potential infringers simultaneously. *Jamesbury Corp. v. Litton Industrial Products, Inc.*, 839 F.2d 1544, 1553 (Fed.Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988); *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1330 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). The existence of additional infringers does not justify Coral's continuing illegal conduct.

55C. When considering whether the patentee will suffer irreparable harm if a preliminary injunction to halt further infringement is denied, a period of delay before the patentee brought his mo-

tion is only one factor in the context of the totality of the circumstances. *Whistler Corp. v. Dynascan Corp.*, 9 U.S.P.Q.2d 2087, 2088, 1988 WL 142216 (N.D.Ill.1988). *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed.Cir.1988). In patent cases only a considerably lengthy delay in filing for an injunction in combination with other facts indicating a lack of harm might warrant a conclusion that the patentee has not established a likelihood of irreparable harm. "[T]he majority of infringement cases where preliminary injunctive relief has been denied involved delays of more than one year." *Whistler Corp.*, 9 U.S.P.Q.2d at 2088.

55D. The relative size of a patent infringer should not alone serve as a basis for enjoining or refusing to enjoin continued infringement by that infringer. *Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed.Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).

56. The Court concludes, based on the evidence presented, that Henkel will be irreparably harmed if an injunction is not granted and Coral is permitted to continue to sell its low temperature aqueous acidic aluminum can cleaning products Clene 100/ACC–2.

## BALANCE OF HARDSHIPS

57. The third factor required to be considered by this Court in its determination whether to award an injunction at this stage of the proceedings is the balance of hardships. This Court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted. *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed.Cir.1988); *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987).

58. The magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer. Henkel has demonstrated that the threat-

ened hardship and injury to Henkel, if an injunction is not granted, outweighs any alleged hardship and injury to Coral if the injunction is granted. *Pittway v. Black & Decker,* 667 F.Supp. 585, 592 (N.D.Ill.1987). Henkel will continue to suffer lost sales and market share and lost opportunities to expand its business in related product areas. Coral, on the other hand, asserts that the loss of 10–25% of its business will devastate the company. However, Coral's alleged harm is self-inflicted.

> One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.

*Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n. 12 (Fed.Cir.1986). This is especially true where Coral has admitted that a viable non-infringing alternative is available, and the switch to such alternative will not involve any significant change in production facilities or personnel.

### PUBLIC INTEREST

59. The fourth factor that must be considered by this Court in determining whether to issue the injunction is the impact of the injunction on the public interest. Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some "critical public interest that would be impaired by the grant of preliminary relief." *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1458 (Fed.Cir.1988). The Court, where relevant, should take into account both the possibility of harm to other interested persons from the grant or denial of the injunction, and the public interest. *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1579 (Fed. Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

60. The protection of patents furthers a strong public policy which is advanced by granting preliminary injunctive relief when it appears that, absent such relief, patent rights will be flagrantly violated. *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 391 (Fed.Cir.1987); *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983) (public policy favors protection of the rights secured by the valid patents). "[I]n patent cases protection usually requires immediate injunctive relief ... protecting patents from would-be infringers is always acting in the public interest." *Pittway v. Black & Decker,* 667 F.Supp. 585, 593 (N.D.Ill.1987). If a patentee cannot rely on its patent to exclude others the "research and development budgets in the science and technology based industries would shrink, resulting in the public no longer benefitting from the labors of these talented people." *E.I. DuPont deNemours & Co. v. Polaroid Graphics Imaging, Inc.,* 706 F.Supp. 1135, 1146 (D.Del.), *aff'd mem.,* 887 F.2d 1095 (Fed.Cir.1989). This is such a case.

61. The Court concludes that there is no critical public interest that would be impaired by the grant of preliminary relief and that the public interest favors the grant of a preliminary injunction.

61A. Any Conclusion of Law entered herein that may be considered in whole or in part as a Finding of Fact and any Finding of Fact entered herein that may be considered in whole or in part as a Conclusion of Law shall be so deemed and treated, as if set forth under the appropriate headings above.

### CONCLUSION

62. Where, as here, Henkel has shown that it is likely to succeed on the merits; that it will suffer irreparable harm if preliminary relief is not granted; that the balance of hardships tilts in favor of Henkel; and that the public interest is best served by enforcing a valid United States patent, a preliminary injunction should issue. Therefore, a preliminary injunction shall issue against Coral enjoining it, and its officers, agents, employees, and attorneys, and those acting in concert or participation with Coral who receive notice of the injunction, from further infringement of the '661 patent.

## CONCLUSION AND ORDER

Considering all of the foregoing the Court has determined that the plaintiff, Henkel Corporation has shown that it has a valid patent that it has a right to defend, and that in pursuit of this right against the defendant, Coral, Incorporated, plaintiff will suffer irreparable harm if the preliminary relief sought herein is not granted. The Court has further determined that the balance of hardships tilts in favor of the plaintiff, and that the public interest will best be served by the immediate enforcement of plaintiff's rights under such patent through a preliminary injunction. Now, therefore, it is the conclusion and order of this Court that a preliminary injunction issue forthwith against Coral, Incorporated enjoining it, and its officers, agents and assigns, and those acting in concert or participation with the defendant who receive notice of this injunction, from further acts of infringement of the United States Patent No. Re. 32,661.